[This opinion has been published in *Ohio Official Reports* at 79 Ohio St.3d 514.]

THE STATE OF OHIO, APPELLEE, *v*. KEITH, APPELLANT.

[Cite as *State v. Keith*, 1997-Ohio-367.]

*Criminal law—Aggravated murder—Death penalty upheld, when.*

(No. 96-1149—Submitted March 4, 1997—Decided October 1, 1997.)

APPEAL from the Court of Appeals for Crawford County, No. 3-94-14.

_____

{¶ 1} Appellant, Kevin Keith, appeals from his convictions and sentence to death for the aggravated murders of Marichell Chatman, Linda Chatman, and Marchae Chatman and his convictions for the attempted aggravated murders of Quanita Reeves, Quinton Reeves, and Richard Warren.

{¶ 2} On the evening of February 13, 1994, Marichell Chatman, her seven-year-old daughter, Marchae, and Richard Warren, who had been living with Marichell and Marchae for several weeks, were at Marichell's apartment in the Bucyrus Estates. At the time, Marichell was babysitting her young cousins, Quanita and Quinton Reeves. At approximately 8:45 p.m., Marichell's aunt, Linda Chatman, arrived at the apartment to pick up Quanita and Quinton, Linda's niece and nephew.

{¶ 3} A few minutes after Linda arrived, Warren, momentarily diverted from a basketball game he was watching on television, noticed a man standing outside the apartment door. Although the man began to walk away without knocking, Warren opened the door. The man turned and asked for Linda.

{¶ 4} While Linda went outside and spoke with the man, Marichell told Warren the man's full name. Although Warren could recall only the first name, Kevin, he later identified appellant as the man at the door. Marichell also mentioned that Kevin had been involved in a big drug bust.

**{¶ 5}** After a short time, Linda and appellant returned to the apartment, where appellant and Warren had a brief conversation. According to Warren, appellant appeared to have his turtleneck shirt pulled up over the bottom part of his face and even drank a glass of water through it.

**{¶ 6}** After drinking the glass of water, appellant pulled a nine-millimeter handgun from a plastic bag he carried and ordered everyone to lie on the floor. Appellant repeatedly scolded Marichell for using his first name when she asked what he was doing and why. Despite Marichell's pleas with appellant on behalf of the children, appellant placed the gun to her head. After ordering Marichell to be quiet, appellant said, "Well, you should have thought about this before your brother started ratting on people." Marichell responded, "Well, my brother didn't rat on anybody and even if he did, we didn't have anything to do with it." Testimony at trial confirmed that Marichell's brother, Rudel Chatman, was a police informant in a drug investigation involving appellant. According to the presentence report, the month prior to the murders, appellant was charged with several counts of aggravated trafficking.

**{¶ 7}** Next, Warren heard a gunshot but was forced to turn away when a bullet struck him in the jaw. Warren heard ten to twelve additional shots, two more striking him in the back. After he heard the apartment door close, Warren ran out of the apartment, across a snow-covered field to Ike's Restaurant, yelling for help. Four or five more shots were fired, one striking him in the buttocks and knocking him down. Warren was able to get up and obtain help from the restaurant.

**{¶ 8}** Another Bucyrus Estates resident, Nancy Smathers, heard several popping noises at approximately 9:00 p.m. As she looked out her front door, Smathers saw a large, stocky black man run to the parking lot and get into a light-colored, medium-sized car. As the car sped away, it slid on the icy driveway and into a snowbank. When the driver got out of the car, Smathers noticed that the car's dome light and the light around the license plate did not work. The driver rocked

the car back and forth for nearly five minutes before he was able to free the car from the snowbank. Several weeks later, Smathers informed Bucyrus Police Captain Michael Corwin that, after seeing appellant on television, she was ninety percent sure appellant was the man she had seen that night.

{¶ 9} When medical personnel arrived at the Bucyrus Estates apartment, Linda and Marichell Chatman were dead, having suffered multiple gunshot wounds, including fatal wounds to the neck or head. All three children initially survived the attack. However, Marchae's two gunshot wounds to her back proved fatal. The Reeves children each sustained two bullet wounds and serious injuries.

{¶ 10} Approximately eight hours after the shootings, Warren was recovering from surgery at a Columbus hospital. During a postoperative interview with a nurse, Warren wrote "Kevin" on a piece of paper as the name of his assailant. Later that day, Bucyrus Police Captain John Stanley had two telephone conversations with Warren. During the second conversation, Stanley mentioned three or four possible last names for Kevin. At trial, Stanley could only recall that he mentioned the names Kevin Thomas and Kevin Keith. Warren stated that he was seventy-five percent sure the name he heard from Marichell was Kevin Keith. When shown a photo array of six suspects, Warren chose appellant's picture and told police he was ninety-five percent sure that appellant was the murderer.

{¶ 11} Investigators recovered a total of twenty-four cartridge casings from the crime scene area, which had all been fired from the same gun. In addition to those, investigators recovered a casing found on the sidewalk across from the entrance to a General Electric plant. On the night of the murders, appellant picked up his girlfriend, Melanie Davison, from work at the entrance to the General Electric plant where the casing was found.

{¶ 12} At the snowbank where Smathers witnessed the getaway car slide, investigators made a cast of the tire tread and of the indentation in the snowbank made by the car's front license plate number—"043." The indentation from the

3

license plate matched the last three numbers of a 1982 Oldsmobile Omega seized from Melanie Davison shortly after she visited appellant in jail, under the psuedonym of Sherry Brown, a few weeks after the murders.

{¶ 13} The Oldsmobile was registered to Alton Davison, Melanie's grandfather, and was also regularly used by Melanie. Davison had put four new tires on the Omega six months prior to the murders. Davison estimated that by February 1994, the new tires had been driven less than 3,000 miles without any problems or need for replacement. Although the cast taken of the tire tread at the crime scene did not match tires found on the Oldsmobile Omega one month later, the cast did match the tread of the tires purchased by Alton Davison as shown on the tire's sales brochures. Additionally, the tires found on the Oldsmobile Omega had been manufactured in January 1994 and showed a minimal amount of wear.

{¶ 14} The grand jury indicted appellant on three counts of aggravated murder, each carrying a specification that the murder was committed as part of a course of conduct involving the killing of two or more persons. R.C. 2929.04(A)(5). Appellant was also indicted on three counts of attempted aggravated murder. R.C. 2923.02.

{¶ 15} After a two-week trial, a jury found appellant guilty of all counts. Following the verdict, defense counsel requested a presentence investigation and a postconviction sanity hearing. During the penalty phase of the trial, defense counsel waived both opening and closing statements. The court submitted, without objection, the presentence investigation report and the results of the psychological examination to the jury. The jury recommended and the trial court imposed a death sentence for each of the aggravated murder counts. The court of appeals affirmed the convictions and the sentence.

{¶ 16} The cause is now before this court upon an appeal as of right.

_____

*Russell B. Wiseman*, Crawford County Prosecuting Attorney, *Betty D. Montgomery*, Attorney General, *Stuart W. Harris* and *Michael L. Collyer*, Assistant Attorneys General, for appellee.

*Reinhart Law Office* and *Harry R. Reinhart; Carol A. Wright* and *Stephen Cockley*, for appellant.

————————————

**COOK, J.**

**{¶ 17}** Appellant presents this court with eight propositions of law, raising issues as to both the guilt and sentencing phases of his trial. In accordance with the mandate of R.C. 2929.05(A), we have considered each of appellant's propositions of law and have reviewed the sentence for appropriateness and proportionality.

**{¶ 18}** We have previously held that R.C. 2929.05 does not require this court to address and discuss, in opinion form, each proposition of law raised in a capital case. See, *e.g., State v. Davis* (1996), 76 Ohio St.3d 107, 110, 666 N.E.2d 1099, 1104; *State v. Allen* (1995), 73 Ohio St.3d 626, 628, 653 N.E.2d 675, 680. Accordingly, we address only those issues that warrant discussion. For the reasons that follow, we affirm the judgment of the court of appeals as to both the convictions and sentence.

I

GUILT PHASE

A

Voir Dire

**{¶ 19}** In his second proposition of law, appellant argues that the trial court erred by instructing prospective jurors, prior to voir dire, that their sentencing determination would be a "recommendation" to the court. The trial court instructed the jury: "[D]epending on your action in the first trial, you might then be involved in a second proceedings [*sic*]. If the second proceeding takes place, you will have to make a recommendation, and I repeat, it is a recommendation to the Court on a

sentence. And one of the recommendations could be the death penalty. If you do make a recommendation, before that sentence is ordered, this Court must independently determine if that recommendation is supported with the proof of the evidence beyond a reasonable doubt." These comments, appellant argues, misstated the law and served to diminish the jury's sense of responsibility in recommending an appropriate sentence.

{¶ 20} Appellant's counsel made no objection to the court's preliminary instruction and thus waived all but plain error. See *State v. Slagle* (1992), 65 Ohio St.3d 597, 605, 605 N.E.2d 916, 925. Plain error is an obvious error or defect in the trial proceedings that affects a substantial right. Crim.R. 52(B). Under this standard, reversal is warranted only when the outcome of the trial clearly would have been different without the error. *State v. Long* (1978), 53 Ohio St.2d 91, 7 O.O.3d 178, 372 N.E.2d 804, paragraph two of the syllabus.

{¶ 21} R.C. 2929.03(D)(2) states that "[i]f the trial jury *recommends* that the offender be sentenced to life imprisonment * * * the court shall impose the sentence *recommended* of the jury upon the offender." (Emphasis added.) The trial court's instruction accurately reflected the law. At the heart of appellant's complaint, then, is that the trial court informed the jury that a recommended death sentence was reviewable by the court but did not inform them that a recommendation for a life sentence was binding upon the court.

{¶ 22} We prefer that no reference be made to the finality of the jury's sentencing decision at all. See, *e.g., State v. Rogers* (1986), 28 Ohio St.3d 427, 433, 28 OBR 480, 485, 504 N.E.2d 52, 57, reversed on other grounds (1987), 32 Ohio St.3d 70, 512 N.E.2d 581. Thus, the trial court's failure to inform the jury of the binding nature of the life sentence recommendation does not constitute plain error. Additionally, we have consistently rejected the argument that an instruction informing the jury that a recommendation of death is reviewable by the trial court constitutes reversible error. See, *e.g.*, *State v. Carter* (1995), 72 Ohio St.3d 545,

559, 651 N.E.2d 965, 977; *State v. Woodard* (1993), 68 Ohio St.3d 70, 77, 623 N.E.2d 75, 80-81. Likewise, we find no plain error in the trial court's preliminary instruction to the potential jurors in the case at bar.

{¶ 23} Nor do we find trial counsel ineffective for failing to object to the trial court's "recommendation" language. Reversal of a conviction on the grounds of ineffective assistance of counsel requires that defendant show, first, that counsel's performance was deficient, and second, that the deficient performance prejudiced the defense so as to deprive defendant of a fair trial. *Strickland v. Washington* (1984), 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674, 693. We find that appellant has shown neither that counsel's performance fell below an objective standard of reasonable representation nor that there exists a reasonable probability that, were it not for counsel's errors, the result of the trial would have been different. *State v. Bradley* (1989), 42 Ohio St.3d 136, 538 N.E.2d 373, paragraphs two and three of the syllabus.

{¶ 24} In this same proposition of law, we are told that the trial court erred by excluding prospective jurors who expressed "scruples" about the death penalty. Appellant directs his complaint first at the form of the question the trial court posed to each potential juror. The trial court asked whether "[i]n a proper case if the facts warrant it and the law permits it, could you join in signing a verdict form which might recommend to the Court the imposition of the death penalty?"

{¶ 25} Because appellant failed to object to the court's question, we apply the plain error standard and reverse only if the outcome of the trial clearly would have been different without the error. *Long*, 53 Ohio St.2d 91, 7 O.O.3d 178, 372 N.E.2d 804, paragraph two of the syllabus. A prospective juror may be excused for cause because of his general opposition to the death penalty when "the juror's views would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and oath." *State v. Rogers* (1985), 17 Ohio St.3d 174, 17 OBR 414, 478 N.E.2d 984, paragraph three of the syllabus, vacated and

remanded on other grounds (1985), 474 U.S. 1002, 106 S.Ct. 518, 88 L.Ed.2d 452, following *Wainwright v. Witt* (1985), 469 U.S. 412, 105 S.Ct. 844, 83 L.Ed.2d 841.

{¶ 26} Although it is true, as appellant now challenges, that the trial court did not use the language "prevent or substantially impair" in his question to the jurors, we find no plain error in the procedure utilized by the court. The trial court's question was designed to elicit a response that would ensure that jurors could fairly and impartially consider the death penalty in accordance with the law.

{¶ 27} Appellant next challenges the excusal of jurors based on their responses to the trial court's question. When asked if they could recommend the death penalty if the law permitted and the facts warranted it, three jurors responded, "No * * * I don't think so," "No, I don't think I can," and "I don't think I can do that." Three other jurors responded, "That is bothering me," "That would be an uncomfortable thing for me to do," and "I have some problems with that." Each juror was excused by the trial court without further inquiry and without objection by defense counsel. Appellant argues that these jurors were erroneously excluded because they did not unequivocally state that they would not impose the death penalty.

{¶ 28} The Sixth Amendment's guarantee of an impartial jury is violated by the exclusion of an impartial juror simply because he expresses some reservations about imposing the death penalty. *Witherspoon v. Illinois* (1968), 391 U.S. 510, 520-523, 88 S.Ct. 1770, 1776-1778, 20 L.Ed.2d 776, 783-785. It is not violated, however, by the exclusion of a juror whose expressed reservations are such as to "'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.'" *Wainwright v. Witt*, 469 U.S. at 424, 105 S.Ct. at 852, 83 L.Ed.2d at 851-852, quoting *Adams v. Texas* (1980), 448 U.S. 38, 45, 100 S.Ct. 2521, 2526, 65 L.Ed.2d 581, 589. Because determinations of juror bias largely depend on the trial judge's assessment of the potential jurors'

demeanor and credibility, deference must be paid to the trial court. *Witt*, 469 U.S. at 426, 105 S.Ct. at 853, 83 L.Ed.2d at 852-853.

{¶ 29} We conclude that the trial court acted within its discretion when it excluded prospective jurors whose responses to the court's question reflected an inability to follow the law or the court's instructions in imposing the death sentence. *State v. Mack* (1995), 73 Ohio St.3d 502, 510, 653 N.E.2d 329, 336. We have deferred to the trial court's determination of juror bias where, similar to this case, a juror responded that she did not think she could fairly consider the death penalty. *State v. Combs* (1991), 62 Ohio St.3d 278, 285-286, 581 N.E.2d 1071, 1078.

{¶ 30} The more difficult question arises in the instance of the jurors who indicated only that they would be either "bothered" or "uncomfortable" in recommending a death sentence or would find recommending the death penalty "difficult." Nothing in the printed record indicates whether their discomfort with recommending the death penalty would impair their ability to follow the law.

{¶ 31} However, the fact that there were no objections to the removal of these prospective jurors may support the propriety of the trial court's decision. *Wainwright v. Witt*, 469 U.S. at 434-435, 105 S.Ct. at 857-858, 83 L.Ed.2d at 858. Although the printed record may not be clear, the reason for the excusals may well have been readily apparent to those viewing the jurors as they answered the question. *Id.* This conclusion is further supported by the trial court's conduct during the voir dire process. Earlier in voir dire, the trial court noted hesitation in a juror's response to the court's question and on two occasions further probed into a jurors' responses to the question. Apparently, the trial judge did not think further inquiry was necessary in the challenged instances. Likewise, counsel did not object or attempt to rehabilitate the jurors. Accordingly, we defer to the trial court's determination of juror bias under these circumstances.

{¶ 32} Even assuming there was error, given the absence of an objection, the error is not a plain one; that is, the outcome of the trial would not have clearly

been different absent the error. Cf. *Bracy v. Gramley* (C.A.7, 1996), 81 F.3d 684, 695, reversed on other grounds (1997), 520 U.S. ___, 117 S.Ct. 1793, 138 L.Ed.2d 97 (in the absence of an objection, trial court's error, if any, in excusing juror based on his answer that he would "probably" not consider imposing the death penalty was not an error of constitutional proportions).

{¶ 33} Finally, in this second proposition of law, appellant alleges that his trial counsel was ineffective for failing to object to the excusal of the "scrupled" prospective jurors. Reversal of a conviction on the grounds of ineffective assistance of counsel requires that defendant show, first, that counsel's performance was deficient, and second, that the deficient performance prejudiced the defense so as to deprive defendant of a fair trial. *Strickland*, 466 U.S. at 687, 104 S.Ct. at 2064, 80 L.Ed.2d at 693. "[C]ounsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Id.* at 690, 104 S.Ct. at 2066, 80 L.Ed.2d at 695.

{¶ 34} We have previously declined to call counsel ineffective for failing to rehabilitate jurors in this context, stating counsel was in a much better position to determine whether the jurors merited in-depth examination. *State v. Phillips* (1995), 74 Ohio St.3d 72, 85, 656 N.E.2d 643, 658-659. Recognizing that voir dire is largely a matter of strategy and tactics, we find that counsel in the present case was in a much better position to determine whether the prospective jurors qualified to be on the panel. The reason for excusing these prospective jurors may have been readily apparent to those viewing the jurors as they answered the question. Earlier in voir dire, counsel noted hesitation in another juror's response to the trial court's death penalty question and inquired further about her views on the death penalty. In the case of the excused jurors, the trial court did not inquire further and counsel did not object or attempt to question when both had done so earlier in the voir dire process. Moreover, counsel's failure to object to the jurors' excusal for cause may

have saved him from later exercising a peremptory challenge to remove these jurors for some reason not evident from the printed record before us.

{¶ 35} Even if we were to assume counsel was deficient, we would nonetheless find that appellant was not prejudiced by counsel's performance. To demonstrate prejudice, appellant must show that there exists a reasonable probability that, were it not for counsel's errors, the result of the trial would have been different. *State v. Bradley* (1989), 42 Ohio St.3d 136, 538 N.E.2d 373, paragraph three of the syllabus.

{¶ 36} Although not cited by appellant in support of this proposition of law, we find that *Gray v. Mississippi* (1987), 481 U.S. 648, 107 S.Ct. 2045, 95 L.Ed.2d 622, is significant here. In *Gray*, the Supreme Court held that a wrongful *Wainwright v. Witt* exclusion was not subject to a harmless error analysis. The court reasoned that prejudice to a defendant from a wrongful exclusion can be presumed because such an error results in a jury "stacked" against the defendant and "organized to return a verdict of death." *Id.* at 666, 107 S.Ct. at 2055-2056, 95 L.Ed.2d at 638.

{¶ 37} We find, however, the *Gray* analysis unpersuasive in the context of ineffective assistance of counsel. First, *Gray* is distinguishable on factual grounds. In that case, as the Supreme Court held, voir dire showed that the prospective juror was "'clearly qualified to be seated as a juror under the *Adams* and *[Wainwright v.] Witt* criteria,'" and, thus, was wrongfully excluded. 481 U.S. at 659, 107 S.Ct. at 2052, 95 L.Ed.2d at 633; see, also, 481 U.S. at 669, 107 S.Ct. at 2057, 95 L.Ed.2d at 640 (Powell, J., concurring). In contrast, in the case at bar, both the trial court and counsel agreed that the prospective jurors were not qualified to sit on the panel before that was clearly established by voir dire. As the *Gray* court noted, the inadequate questioning regarding these jurors' views precludes an appellate court from determining whether the trial judge erred in removing them. 481 U.S. at 662-663, 107 S.Ct. at 2054, 95 L.Ed.2d at 636.

**{¶ 38}** In any event, nothing in *Gray* persuades us to extend its holding regarding the presumption of prejudice to the ineffective assistance of counsel claim. Thus, we decline to presume that counsel's error, if any, resulted in an impaneled jury that was stacked against the defendant or organized to return a verdict of death. To the contrary, the record demonstrates that the seated jurors were able to follow their oaths and make a recommendation of death only when the law permitted and the facts warranted it. Thus, we find that appellant has failed to demonstrate a reasonable probability that the outcome of the trial would have been different. Accordingly, we overrule appellant's second proposition of law.

B

Identification Testimony

**{¶ 39}** In his third proposition of law, appellant challenges the trial court's failure to suppress the name array testimony, alleging that the procedure utilized by the police was so impermissibly suggestive as to result in an unreliable and inadmissible identification of appellant.

**{¶ 40}** The day following the shootings, Bucyrus Police Captain John Stanley contacted Warren, who was recovering from surgery in the hospital. Stanley listed for Warren a series of four names, which included "Kevin Keith" and "Kevin Thomas," to assist Warren's recollection of the name Marichell had used to identify the shooter. Though Warren thought one of the other names Stanley mentioned was Smith, neither Warren nor Stanley could recall any other names mentioned. Stanley explained that he simply made the names up and forgot them. Nonetheless, Warren told Stanley that he was seventy-five percent sure the name he heard from Marichell was Kevin Keith. When later shown a photo array of six suspects, Warren chose appellant's picture and told police he was ninety-five percent sure that appellant was the murderer.

**{¶ 41}** Only one other court appears to have confronted this precise name-array issue. In *United States v. Tovar* (1982), 687 F.2d 1210, 1216, the Eighth

12

Circuit Court of Appeals held simply that the procedures utilized by the police in the name array were not "impermissibly suggestive." Assuming the same principles that apply to photo-array and line-up cases apply to a name array, we likewise find that appellant has failed to demonstrate that the procedure utilized by the police was improper or unduly suggestive. Nothing in the record demonstrates that the names selected were suggestive, as would be a series of ethnic names. We decline appellant's invitation to apply a *per se* rule that the procedure used was unduly suggestive because of Stanley's failure to recall the entire list of names included in the array. Unless appellant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law, nor should it lead to a presumption of suggestiveness. See, generally, *Arizona v. Youngblood* (1988), 488 U.S. 51, 57-58, 109 S.Ct. 333, 337, 102 L.Ed.2d 281, 289. No showing of bad faith has been made here.[1]

{¶ 42} Even if we were to assume, for argument's sake, that the procedure utilized by the police in the name-array identification was impermissibly suggestive, we would, nonetheless, find the identification testimony admissible. An unneccessarily suggestive identification process does not violate due process if the identification possesses sufficient indicia of reliability. *Manson v. Brathwaite* (1977), 432 U.S. 98, 114, 97 S.Ct. 2243, 2253, 53 L.Ed.2d 140, 154. In determining "whether under the 'totality of the circumstances' the identification was reliable even though the confrontation procedure was suggestive * * * the factors to be considered in evaluating the likelihood of misidentification include the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time

---

1. Although appellant challenges Nancy Smather's identification, he presents no argument as to why the identification process in her case was unduly suggestive, nor does any reason appear in the record.

between the crime and the confrontation." *Neil v. Biggers* (1972), 409 U.S. 188, 199, 93 S.Ct. 375, 382, 34 L.Ed.2d 401, 411.

{¶ 43} Considering the totality of the circumstances, we find sufficient indicia of reliability in Warren's identification of appellant. Shortly before the murders, Marichell told Warren appellant's full name. Warren identified appellant's name the day after the murders. Warren additionally declared that he was seventy-five percent sure of the name Keith. Accordingly, we overrule the third proposition of law.

C

Affidavit of Indigency

{¶ 44} By his fourth proposition of law, appellant alleges that the trial court violated his right to counsel when the court failed to sufficiently inquire into an affidavit of indigency appellant filed two months before the trial began. In the affidavit, appellant swore that he was "without the necessary funds with which to pay for the Attorney in this case and * * * without any possessions, real or personal of sufficient value to offer as security for such costs." At the time appellant filed the affidavit, he had already retained James Banks as his attorney.

{¶ 45} Appellant relies upon *State v. Deal* (1969), 17 Ohio St.2d 17, 46 O.O.2d 154, 244 N.E.2d 742, in support of his argument. In that case, the court imposed an affirmative duty upon the trial court to inquire, on the record, into a defendant's complaints regarding the adequacy of his appointed counsel. In *Deal*, as in the other cases cited by appellant, the defendant expressed his dissatisfaction with his counsel to the trial court. See, also, *State v. Prater* (1990), 71 Ohio App.3d 78, 593 N.E.2d 44 (defendant specifically informed the court that he did not want assigned counsel to represent him); *State v. VanMeter* (July 11, 1985), Franklin App. No. 84AP-987, unreported, 1985 WL 10073 (prior to trial, defendant requested a continuance so that he might obtain new counsel).

**{¶ 46}** Although appellant argues that the affidavit itself was an indication of his dissatisfaction with his retained counsel, we find no support in the record for such a finding. There is no complaint in the affidavit that his counsel, Banks, was providing inadequate representation. The affidavit alleges only that appellant was without the necessary funds to pay for costs of representation and defense. Such an affidavit would be appropriate for other reasons, such as to secure the services of experts at the state's expense.

**{¶ 47}** There is no other evidence in the record that should have alerted the trial court to appellant's dissatisfaction with his retained counsel. Upon appellant's motion to correct the record after trial, the trial court issued the following statement:

"Why wasn't there any action taken on Kevin Keith's affidavit of indigency which he filed with the Court? * * * The Court recalls specifically asking the Defendant if he agreed to proceed with his attorney and he offered no objection. As the Court explained to one of the appellate attorneys, it does not recall whether or not this was on the record during any of the proceedings, however, this Court specifically remembers the look on Defendant's face when the Court asked him the question."

**{¶ 48}** We find nothing in the record to support appellant's contention that the trial court should have further inquired into appellant's satisfaction with his retained counsel. Therefore, we overrule appellant's fourth proposition of law.

D

Publication of Videotape

**{¶ 49}** In this fifth proposition of law, appellant challenges the playing of a videotaped television interview of Gracie Keith, appellant's aunt and alibi witness. During the trial, Keith testified that appellant was with her at her home at the approximate time of the murders. On cross-examination, the prosecutor asked Keith if she remembered telling a television interviewer, "I can't say that [defendant was with me during the killings] [']cause I don't know what time it was * * *."

Keith denied that she made such a statement. On redirect, defense counsel attempted to clarify her statement, suggesting that she had denied knowing when the murder was, not when appellant was with her.

{¶ 50} During the state's rebuttal case, Bucyrus Police Captain Blankenship testified that he possessed a videotape, subpoenaed by the grand jury, that contained taped footage of the crime scene and interviews broadcast by Channel 68 in Mansfield. Appellant objected to the playing of the videotape under Evid.R. 801(D)(1), pointing out that Keith was not under oath when she gave the interview, and claiming that the alleged inconsistent statement should have been raised when she testified. The trial court overruled the objection and permitted the state to show the videotape to the jury. Appellant now complains that the trial court erroneously played the videotape when it lacked the proper foundation and authentication and was not admitted into evidence. Because appellant did not object to the videotape on these grounds at trial, he waived these issues absent plain error.

{¶ 51} The state presented the videotaped statements for purposes of impeaching Keith. Pursuant to Evid.R. 613(B), when extrinsic evidence of a prior inconsistent statement is offered into evidence, a foundation must be established through direct or cross-examination in which (1) the witness is presented with the former statement, (2) the witness is asked whether he made the statement, (3) the witness is given an opportunity to admit, deny, or explain the statement, and (4) the opposing party is given an opportunity to interrogate the witness on the inconsistent statement. *Mack*, 73 Ohio St.3d at 515, 653 N.E.2d at 339, quoting *State v. Theuring* (1988), 46 Ohio App.3d 152, 155, 546 N.E.2d 436, 439. We find that the state properly established the foundation under Evid.R. 613(B) for the use of Keith's prior inconsistent statement.

{¶ 52} Appellant also complains that the trial court permitted the state to play the videotape when the tape was not authenticated. The requirement of authentication is satisfied by evidence sufficient to support a finding that the matter

16

in question is what its proponent claims. Evid.R. 901(A). Here, Captain Blankenship testified only that the videotape he possessed was the same videotape containing crime scene footage and interviews of Channel 68 subpoenaed by the grand jury. Nonetheless, we find that the playing of the videotape did not alter the outcome of the trial and does not constitute plain error. Gracie Keith was not appellant's sole alibi witness. Judith Rogers placed appellant's leaving his apartment at 8:45 p.m., the approximate time the assailant arrived at the Chatman apartment. Thus, it is not clear that absent the playing of the videotape, the outcome of the trial would have been different.

{¶ 53} Appellant also contends that the trial court's instructions regarding the jury's consideration of the videotape's contents "hopelessly confused" the jury. When the trial court denied the jury's request to play the videotape during its deliberations, the jury asked, "We would like to know why we can't see the taped interview of Grace Keith? If it was not introduced as evidence why was it shown to us?" The trial court explained that "although what was said by Gracie Keith was evidence, you have to take it as if it came from the witness stand. The actual physical tape was not introduced into evidence. Therefore, I cannot play the tape for you. You are going to have to judge that tape by the testimony as if she said it right from the witness stand to your best collective recollection of what she said." Upon objection from defense counsel, the trial court further instructed the jury that "you really can't consider the conversation on that tape as if it comes from the witness stand because she was not under oath when she gave it. However, the words are still before you. What that was, was just the television interview."

{¶ 54} Viewing the instructions as a whole, we find that they are neither confusing nor prejudicial. The court's erroneous instruction was immediately remedied by a curative instruction, to which defense counsel did not object. We find that appellant's fifth proposition of law lacks merit.

E

Juror Misconduct

**{¶ 55}** By his sixth proposition of law, appellant charges that several instances of juror misconduct deprived him of a fair trial. To support his argument, appellant relies on *State v. King* (1983), 10 Ohio App.3d 161, 10 OBR 214, 460 N.E.2d 1383, paragraph one of the syllabus, for the proposition that any improper juror conduct automatically raises the presumption of prejudice. On numerous occasions, however, we have reaffirmed a long-standing rule that a court will not reverse a judgment based upon juror misconduct unless prejudice to the complaining party is shown. See, *e.g.*, *State v. Grant* (1993), 67 Ohio St.3d 465, 480, 620 N.E.2d 50, 67; *State v. Hipkins* (1982), 69 Ohio St.2d 80, 83, 23 O.O.3d 123, 125, 430 N.E.2d 943, 946. In cases of improper outside juror communication, the defense must establish that the communication biased the juror. *State v. Phillips* (1995), 74 Ohio St.3d 72, 88-89, 656 N.E.2d 643, 661. Furthermore, trial courts are granted broad discretion in dealing with the outside contact and determining whether to declare a mistrial or replace an affected juror. *Id*. at 89, 656 N.E.2d at 661.

**{¶ 56}** The first instance of alleged misconduct involved reports that a juror, Julie Dyer, discussed the case with several persons where she worked. During an in-chambers hearing, Dyer, while under oath, denied discussing the case with anyone, except to tell her boss that she was serving as a juror. Thereafter, the court questioned Tammy Lacey, the person who had contacted the court about the possible misconduct. Lacey testified that while at Dyer's workplace, another employee, Pat Emmer, told her that Dyer was talking to everyone about the case, although Lacey did not have firsthand knowledge of what Dyer had said.

**{¶ 57}** After the court suspended the trial proceedings until the allegations had been resolved, Dyer informed the trial judge that she remembered telling her boss that she was asked a question about bowling during voir dire. She also told her boss some of the reasons why people were not selected for the jury. Dyer also

recalled that she had told Emmer, her co-worker, that she thought that the trial was interesting and found defense counsel "more compelling or more interesting as a lawyer."

{¶ 58} Shortly thereafter, Emmer testified that Dyer told her that the case was interesting, that the jury had visited the crime scene, and that the television reporter was not permitted to show the jurors' faces. Emmer also informed the court that one other person claimed that Dyer had talked about the case but Emmer discounted the possibility by adding, "[H]e could have been lying [']cause that's the type of person he is."

{¶ 59} After excusing Emmer, the trial court discussed the situation with counsel. Defense counsel stated with respect to juror Dyer, "I am impressed. She is saying for one thing it is interesting and she didn't say anything factual and the fact that Channel 4 couldn't take pictures. Everybody knows that anyway. * * * I don't have any problem with her." Over the prosecutor's objection, the court permitted Dyer to remain on the jury.

{¶ 60} The second allegation of juror misconduct concerns an incident that occurred during sentencing deliberations. The court conducted a hearing in chambers with counsel when it learned that a juror had been in a police cruiser with a deputy sheriff. The deputy explained that he had taken the juror to the bank to make a house payment before the bank closed. Neither the deputy nor the juror discussed the case. The juror remained on the panel without objection.

{¶ 61} The final claims of juror misconduct involve unusual telephone calls received by two jurors. Juror Ogle reported to the court that someone left an "unsettling" message on his answering machine. Although unintelligible to the court reporter, Ogle thought the message said, "I know who you are and I know where you live." Ogle, however, believed the call to be a prank and expressed no concern for his safety. He informed the court that he wanted to continue serving

on the jury and felt that the message would not affect his judgment. Juror Ogle remained on the panel without objection from either party.

{¶ 62} The other unusual telephone call involved a juror who received three collect phone calls from a person who identified himself as "Jeff from the Correctional Institute." During an in-chambers hearing before counsel, the juror assured the court that she was "absolutely not" afraid to continue to serve as a juror and that the calls would not influence her deliberations. Neither party objected when the court retained the juror on the panel.

{¶ 63} In each of the in-chambers hearings conducted by the trial court, counsel were freely permitted to inquire of the witnesses and jurors. Nonetheless, appellant failed to object to any of the jurors' remaining seated on the case and, thus, waived all but plain error. The trial court promptly addressed each allegation of outside communications, and determined the facts and possible impact on the juror. We find no abuse of the trial court's discretion and no plain error in allowing the jurors to remain on the panel.

{¶ 64} We reject appellant's argument that the trial court exacerbated the prejudicial effect of the alleged juror misconduct when the trial judge indicated his concern for his own safety to the juror who received the collect calls and informed the jurors he had placed "phone traps" on their telephones, with which calls to their homes could be traced. We find these comments to be of a reassuring nature, and note that even after the trial judge made the comment, the juror assured the court that she was able to continue on the jury unaffected. Thus, we decline to assume prejudice, as appellant would have us do.

{¶ 65} This sixth proposition of law is accordingly overruled.

II

SENTENCING PHASE

{¶ 66} We turn now to appellant's first proposition of law, where he sets forth several issues regarding the mitigation phase of his trial. Appellant initially

takes issue with the trial court's conduct toward the alternate jurors after the jury returned a verdict in the guilt phase. The trial court instructed the alternate jurors to conduct their own deliberations to see if they agreed with the jury's guilt phase verdict. If they agreed with the jury's verdict, the trial court informed the alternates, they would remain for the sentencing phase of the trial. Thereafter, the alternate jurors informed the court that they agreed with the jury "100 percent."

{¶ 67} By failing to raise an objection at trial, appellant waived any error in the instructions to the alternate jurors, absent plain error. *Slagle*, 65 Ohio St.3d at 604, 605 N.E.2d at 924. Appellant cannot demonstrate plain error, however, because none of the alternate jurors ever sat on the jury.

{¶ 68} In this same proposition of law, appellant contests his waiver of the presentation of mitigation evidence. At the outset of the mitigation phase, the trial court and appellant's trial counsel engaged in the following colloquy:

"COURT: Counsel for defendant may proceed with his opening statement.

"MR. BANKS: Your Honor, my client is not desirous of making any statement with regard to this issue.

"THE COURT: Allright. The state may proceed.

"MR. WISEMAN: We have nothing to present, sir."

{¶ 69} Thereafter, the court proceeded with closing arguments. After the state made a brief statement asking the jury to recommend the maximum sentence, defense counsel waived closing argument. With the approval of counsel, the court submitted the presentence investigation report and psychological evaluation that were performed upon appellant's request to the jury to consider during its deliberations.

{¶ 70} Appellant does not argue that the right to present mitigation evidence is one that cannot be waived. A defendant may decide what evidence, if any, to present at a mitigation hearing and may decide to present no evidence, even against the advice of counsel. *State v. Tyler* (1990), 50 Ohio St.3d 24, 553 N.E.2d 576.

Rather, appellant contends that the trial court committed a grave error when it failed to inquire of the appellant whether he knowingly, intelligently, and voluntarily waived the presentation of mitigating evidence. Appellant likens the right to present mitigation evidence to other rights that must be personally waived by a defendant, such as the right to a jury trial and the right to testify at trial, citing *Godinez v. Moran* (1993), 509 U.S. 389, 398, 113 S.Ct. 2680, 2686, 125 L.Ed.2d 321, 331; *Wainwright v. Sykes* (1977), 433 U.S. 72, 93, 97 S.Ct. 2497, 2510, 53 L.Ed.2d 594, 612, fn. 1 (Burger, C.J., concurring). The trial court, appellant continues, neglected to personally address him to determine whether he knowingly, intelligently, and voluntarily waived his right to present mitigation evidence.

{¶ 71} At the outset, we find fault with appellant's arguments that his counsel presented no mitigation evidence. To the contrary, the jury had the psychological report and presentence investigation report to consider during its sentencing deliberations. Thus, appellant's argument that defense counsel waived appellant's right to present all mitigation evidence is unavailing. Nonetheless, we consider appellant's argument as it relates to waiving the right to present additional mitigating evidence.

{¶ 72} At least two states have adopted guidelines or procedures for trial courts when a defendant personally waives his right to present mitigation evidence. *Koon v. Dugger* (Fla.1993), 619 So.2d 246, 250; *Wallace v. Oklahoma* (Okla.Crim.App. 1995), 893 P.2d 504, 512. Neither case, however, addressed the precise argument appellant presents, *i.e.,* whether the right to present mitigation evidence was a fundamental right. Thus, we find them unpersuasive in considering the issue.

{¶ 73} In *Brecheen v. Reynolds* (1994), 41 F.3d 1343, 1368, the Eighth Circuit discussed appellant's precise argument. The court explained that fundamental rights, including the right to appeal, the right to a jury trial, and the right to plead guilty, are waivable only by the defendant because of the personal

nature and importance of the right. Nonfundamental rights, those rights that primarily involve trial strategy and tactics, are waivable by defense counsel on the defendant's behalf.

{¶ 74} The Eighth Circuit concluded that the "question as to the propriety of introducing additional mitigating evidence in this case is not a fundamental right * * * but rather, fits squarely into the category of rights that are nonfundamental and that are not reviewed for compliance with the heightened waiver standard." *Id.* The court elaborated in a footnote that "[i]n spite of the obvious importance of this issue, it is still, at its core, an evidentiary question that is inherently tactical in nature and therefore vested in the discretion of the trial counsel." *Id.* at 1368-1369, fn. 22.

{¶ 75} We, too, find that the ultimate decision to introduce additional mitigating evidence is a not a fundamental right which needs to be personally waived by the defendant. In *State v. Johnson* (1986), 24 Ohio St.3d 87, 91, 24 OBR 282, 286, 494 N.E.2d 1061, 1065, we made clear that "the mere failure to present mitigating evidence at the penalty phase of a capital trial does not itself constitute proof of ineffective assistance of counsel or deprivation of the accused's right to a fair trial. It is conceivable that the omission of such evidence in an appropriate case could be in response to the demands of the accused or the result of a tactical, informed decision by counsel, completely consonant with his duties to represent the accused effectively." Thus, we implicitly recognized that the presentation of mitigating evidence is a matter of trial strategy. It follows that this right fits squarely into the category of rights that are nonfundamental and which may be waived by defendant's counsel. Accordingly, we find no duty for the trial court to secure from the defendant an on-the-record waiver of the right to present mitigating evidence.

{¶ 76} We additionally observe that the record reveals nothing to suggest that defense counsel proceeded against appellant's wishes. To the contrary, appellant's proclamation of innocence in open court prior to sentencing supports

our opinion that appellant waived additional mitigation because he maintained his innocence.

{¶ 77} Appellant next challenges the admission of the psychological evaluation to the jury because the report contained "material misstatements of law." After examining appellant, Dr. William Schonberg prepared a psychological evaluation report. In part, the report stated:

"Under the provisions of the Ohio Revised Code, Section 2929.04; Criteria for Imposing Death or Imprisonment for a Capital Offense, the death penalty will be precluded if the Court found any of three mitigating circumstances. Mr. Keith states that he is innocent of these charges. It would not appear that the offender acted under duress, nor would it appear that the victim of the offense induced or facilitated it. The offense would not appear to have been a product of the offender's mental deficiency or psychosis, the client having no psychiatric history. Therefore, based on interview impressions, it is this examiner's opinion that there are no mitigating factors in this case."

{¶ 78} Appellant did not object to sending the report to the jury. In fact, defense counsel agreed with the trial court that the report "has to go" to the jury. Accordingly, he has waived all but plain error.

{¶ 79} Appellant argues that the psychological report makes the following misstatements of law: (1) that the presence of one or more mitigating factors precludes the death penalty; (2) that the only three mitigating circumstances are whether the offense was committed under duress, whether the victim induced or facilitated the offense, and whether the offense was a product of mental deficiency or psychosis; (3) that the trial court determines the presence of mitigating circumstances; and (4) that the report uses the wrong definition to determine the existence of the mitigating factor of R.C. 2929.04(B)(3), mental disease or defect.

{¶ 80} We agree that the psychological report does not accurately reflect the law. However, we find that any error in presenting the report to the jury does

not rise to the level of plain error, *i.e.,* that but for the misstatements of law, the jury clearly would have sentenced him to life. *Long*, 53 Ohio St.2d 91, 7 O.O.3d 178, 372 N.E.2d 804, paragraph two of the syllabus. In so finding, we consider that the first misstatement cited by appellant actually favored him in that it erroneously asserted that the mere presence of any one of the mitigating factors set forth would preclude the death penalty. As to the other misstatements, the trial court cured any error when it instructed the jury as to its role, the proper standards and mitigating factors to consider, and the method of weighing the aggravating circumstances and mitigating factors.

{¶ 81} It is true, as appellant contends, that the jury correctly challenged the accuracy of some factual statements in the presentence investigation submitted to them. Nonetheless, the jury's attention to factual errors in the presentence investigation does not demonstrate that but for the misstatements of law in the psychological report, the jury would clearly have come to a different conclusion. Nothing in the record suggests that the jury was confused or otherwise affected by the misstatements in the psychological report.

{¶ 82} We also reject appellant's challenge to the trial court's penalty phase instructions. Appellant argues that the trial court erred in failing to instruct the jury that it was obligated to separately consider each aggravating circumstance and weigh it separately against any mitigating factors. The proper standard, however, is that the jury is obligated to separately consider each count and separately weigh the aggravating circumstance or circumstances applicable to each count against any mitigating factors. *State v. Cooey* (1989), 46 Ohio St.3d 20, 544 N.E.2d 895, paragraph three of the syllabus.

{¶ 83} In this case, although only one aggravating circumstance was applicable, the trial judge's instructions to the jury referred to aggravating circumstances. We find no prejudicial error in the instruction, however, because there is no distinction between the aggravating circumstance which was attached to

each of the three counts of aggravated murder. Moreover, the aggravating circumstance itself was multiple murder.

{¶ 84} We also consider appellant's argument that the trial court erroneously instructed the jurors:

"You are to consider all things which are relevant to the nature and circumstances of the aggravating circumstances in the respect that this offense was part of a course of conduct involving the purposeful killing of two or more persons, or to any mitigating factors including but not limited to the nature of the offense and the history, character, and background of the Defendant, plus all of the following * * *."

{¶ 85} The parties evidently agree that the trial judge mistakenly used the term "nature and circumstances of the aggravating circumstances," when he meant the "nature and circumstances of the offense." If that is what the court meant, then the court committed error in instructing the jury, appellant argues, citing *State v. Wogenstahl* (1996), 75 Ohio St.3d 344, 662 N.E.2d 311. We disagree.

{¶ 86} Appellant did not object to the instruction and has waived all but plain error. *State v. Underwood* (1983), 3 Ohio St.3d 12, 3 OBR 360, 444 N.E.2d 1332. In this case, the trial court did not instruct the jury to weigh the nature and circumstances against any mitigating factors. See *State v. Gumm* (1995), 73 Ohio St.3d 413, 422, 653 N.E.2d 253, 263. To the contrary, the trial court instructed the jury that the aggravating circumstances must outweigh the mitigating factors in order to impose a death sentence. The trial court, though inartfully, informed the jury that it could consider the evidence upon which it based its findings that aggravating circumstances were proven in determining whether the aggravating circumstances outweighed the evidence presented in mitigation. We find no plain error in the trial court's instructions to the jury. Viewed in the context of the entire charge rather than in isolation, *State v. Thompson* (1987), 33 Ohio St.3d 1, 12-13, 514 N.E.2d 407, 419, we find no plain error under these circumstances.

**{¶ 87}** Appellant also claims the trial court erred in failing to instruct the jury on residual doubt. However, a defendant is not entitled to such an instruction. *State v. Garner* (1995), 74 Ohio St.3d 49, 56-57, 656 N.E.2d 623, 632.

**{¶ 88}** Finally, appellant objects to the trial court's instruction on all the mitigating factors when no evidence was presented to support all of the factors. Again, we have expressed our view that the better practice is for trial courts to refrain from even referring to mitigating factors not raised by the defendant, but this is not prejudicial error. *State v. DePew* (1988), 38 Ohio St.3d 275, 289-290, 528 N.E.2d 542, 558.

**{¶ 89}** Having considered appellant's arguments, we overrule appellant's first proposition of law.

**{¶ 90}** In his seventh proposition of law, appellant alleges that the trial court failed to comply with R.C. 2929.03(F) by not addressing or recognizing the existence of any mitigating factors set forth in R.C. 2929.04. In his sentencing opinion, the trial judge stated: "Regarding mitigating factors, there were none." The trial court did not then discuss whether the aggravating circumstance outweighed the mitigating factors as to each count. In *State v. Fox* (1994), 69 Ohio St.3d 183, 191, 631 N.E.2d 124, 131, we addressed similar arguments and held that inadequate explanations of the weighing process do not constitute reversible error because any such error may be readily cured by this court's independent review. We adhere to that view.

**{¶ 91}** In his next argument, appellant correctly asserts that the trial court failed to file a sentencing opinion within fifteen days of its judgment entry as required by R.C. 2929.03(F). Nonetheless, appellant has not demonstrated prejudice. *State v. Martin* (1985), 19 Ohio St.3d 122, 132-133, 19 OBR 330, 339, 483 N.E.2d 1157, 1166-1167.

**{¶ 92}** In this same proposition of law, appellant contends that the trial court was biased against him evidenced by the trial court's anger toward appellant for his

comments to the press. Upon our review of the record, we are of the opinion that the judge's comments do not show bias.

{¶ 93} Based upon the foregoing, we overrule appellant's seventh proposition of law.

III

EFFECTIVE ASSISTANCE OF COUNSEL

{¶ 94} In his eighth and final proposition of law, appellant raises twenty-four claims or instances of ineffective assistance of counsel. Reversal of a conviction on the grounds of ineffective assistance of counsel requires that the defendant show, first, that counsel's performance was deficient and, second, that the deficient performance prejudiced the defense so as to deprive defendant of a fair trial. *Strickland*, 466 U.S. at 687, 104 S.Ct. at 2064, 80 L.Ed.2d at 693. To demonstrate that counsel is deficient, appellant must show counsel's performance fell below an objective standard of reasonable representation. *Bradley*, 42 Ohio St.3d 136, 538 N.E.2d 373, paragraph two of the syllabus. To demonstrate prejudice, appellant must prove that there exists a reasonable probability that were it not for counsel's errors, the result of the trial would have been different. *Id*. at paragraph three of the syllabus.

{¶ 95} Appellant argues here, and throughout his brief, that because his trial counsel was not certified pursuant to C.P.Sup.R. 65, he is not entitled to the presumption of competence we usually extend to properly licensed attorneys. See *State v. Wilkins* (1980), 64 Ohio St.2d 382, 390, 18 O.O.3d 528, 533, 415 N.E.2d 303, 309.

{¶ 96} In order to represent an indigent defendant charged with an offense for which the death penalty may be imposed, C.P.Sup.R. 65 requires an attorney appointed by the court to be certified as experienced in capital cases. C.P.Sup.R.65(II)(B). Although appellant's counsel apparently did not meet the qualifications set forth in C.P.Sup.R. 65, we decline to impose a rule that creates a presumption of ineffective assistance of counsel where counsel has been retained by or for a defendant and is not qualified under C.P.Sup.R. 65. The provisions for the appointment of counsel set forth in C.P.Sup.R. 65 apply "only in cases where the defendant is indigent [and] counsel is not privately retained by or for the

defendant * * *." C.P.Sup.R. 65(I)(B). The rule further provides that "[i]f the defendant is entitled to the appointment of counsel, the court shall appoint two attorneys certified pursuant to this rule." C.P.Sup.R. 65(I)(C). In this case, appellant privately retained his trial counsel, and certification under the rule was not required for this representation.

{¶ 97} We turn now to the specific allegations of ineffectiveness. Appellant first contends that his trial counsel failed to properly investigate his case and/or failed to request sufficient time to do so. Yet appellant points to nothing in the record to support his conclusory allegation.

{¶ 98} Seven claimed errors of trial counsel contained in appellant's list of twenty-four errors relate to alleged juror misconduct. Appellant contends his trial counsel was ineffective for failing (1) to object to and make a record of "disruptive influences" occurring during the trial that affected the jury, (2) to request removal of the jurors who had outside communications, (3) to inquire as to why the court had "traps" placed on the jurors' telephone lines, and (4) to request the trial judge to recuse himself after he expressed a concern for his own safety to another juror.

{¶ 99} We find, however, that none of these instances amounts to ineffective assistance of counsel. Appellant has shown neither that counsel's performance fell below an objective standard of reasonable representation nor that there exists a reasonable probability that, were it not for counsel's errors, the result of the trial would have been different. *Bradley*, *supra*.

{¶ 100} Keith also objects to counsel's failure to object to hearsay when Captain Stanley testified at a hearing on the motion to compel discovery relating to the name array he presented to Richard Warren in the hospital. However, this instance did not occur in the jury's presence, and appellant otherwise fails to demonstrate prejudice.

{¶ 101} We similarly reject the merits of appellant's allegation that counsel was ineffective for failing to file a motion to suppress the identification testimony

of Richard Warren and Nancy Smathers. Trial counsel did, in fact, attempt to suppress the testimony as to Warren's identification, and we determined above that the court properly admitted the testimony. We are also convinced that a motion to suppress Smather's testimony would have properly been denied.

{¶ 102} Appellant additionally challenges the zealousness of trial counsel's representation when he accepted, without question, allegations that appellant was intimidating the family of the victims. The record reflects that a security officer in the courtroom reported to the court that he and another officer observed appellant winking and blowing kisses in the direction of the victims' family. We do not find that trial counsel acted unreasonably, especially in light of the fact that the allegations were not raised before the jury.

{¶ 103} Appellant next complains that counsel failed to move to withdraw from the case when he learned information that placed him in a conflict of interest. Appellant refers us to a portion of the transcript in which defense counsel related to the court and prosecutor a meeting he had with an unidentified woman who told defense counsel that she suspected another person was involved in the murders. The woman informed defense counsel of this person's involvement in several other crimes, including murders. In order to satisfy a Sixth Amendment claim of ineffective assistance of counsel, appellant must demonstrate that an actual conflict of interest adversely affected his counsel's performance. *Cuyler v. Sullivan* (1980), 446 U.S. 335, 348, 100 S.Ct. 1708, 1718, 64 L.Ed.2d 333, 346-347; *State v. Manross* (1988), 40 Ohio St.3d 180, 182, 532 N.E.2d 735, 737. Appellant does not state with any particularity either the conflict of interest or the adverse effect upon counsel's performance. We find nothing, from our review of the record, that would raise an inference of an actual conflict of interest. Thus, we reject appellant's argument.

{¶ 104} Appellant's next claim of ineffective assistance raises counsel's failure to object to two instances of hearsay testimony: one from Captain Stanley

that a nurse first mentioned the name "Keith" to him, and another from Joyce Reeves that her daughter, Quanita, referred to appellant as "Bruce" on prior occasions. A statement is not hearsay "if it is admitted to prove that the declarant made it, rather than to prove the truth of its contents." *State v. Williams* (1988), 38 Ohio St.3d 346, 348, 528 N.E.2d 910, 914. We find counsel did not fall below a reasonable standard of representation in not objecting to the testimony.

{¶ 105} We reject appellant's allegations that counsel was ineffective for failing to make a complete record. Appellant neither specifies what parts of the trial record he believes are incomplete nor demonstrates how he was prejudiced. Notably, the record was supplemented by appellate counsel under App.R. 9(E).

{¶ 106} Appellant's final allegations of ineffective assistance of counsel concern the sentencing phase of this trial. Appellant challenges trial counsel's request for a presentence investigation and postconviction sanity hearing. We find, however, that appellant has failed to prove that counsel fell below a reasonable standard of representation in requesting or permitting the reports to be submitted to the jury or that absent the reports, there exists a reasonable probability that the outcome of the trial would have been different. Although the psychological report and the presentence investigation report did contain some errors, these errors were not prejudicial. The trial court corrected the minor errors in the presentence investigation report. We have also determined that one error was favorable to appellant and others were cured by the trial court's instructions. Additionally, the psychological report contained some evidence of mitigation, including references to appellant's family background, work history, and personal interests that the jury would not have otherwise had available to it.

{¶ 107} We also consider trial counsel's failure to present additional mitigation evidence. The decision to forgo the presentation of additional mitigating evidence does not itself constitute proof of ineffective assistance of counsel. *Johnson*, 24 Ohio St.3d at 91, 24 OBR at 286, 494 N.E.2d at 1065. In this case,

counsel's failure to present mitigating evidence was not a demonstrably deficient trial strategy in light of appellant's decision to waive such a presentation. Arguably, it was consistent with appellant's claim of innocence.

{¶ 108} Regardless, we find that appellant has failed to prove prejudice. To do so would require that there was mitigating evidence counsel failed to present and that there is a reasonable probability that the evidence would have swayed the jury to impose a life sentence. Establishing that would require proof outside the record, such as affidavits demonstrating a lack of effort to contact witnesses or the availability of additional mitigating evidence. Such a claim is not appropriately considered on a direct appeal. See *State v. Scott* (1989), 63 Ohio App.3d 304, 308, 578 N.E.2d 841, 844 (claim of failure to present mitigating evidence is properly considered in a postconviction proceeding because evidence in support of claim could not be presented on direct appeal).

{¶ 109} We turn next to counsel's failure to make any opening or closing statement in support of sparing appellant's life. We reject the concept that the failure to make an opening and closing statement will result in ineffectiveness *per se*. In *State v. Ballew* (1996), 76 Ohio St.3d 244, 256-257, 667 N.E.2d 369, 381, we called defense counsel's "extremely brief final argument" at the sentencing hearing "questionable." Yet we also found that the defendant failed to establish that counsel's performance fell below an objective standard of reasonable representation.

{¶ 110} In the present case, counsel's failure to make an opening or closing statement complied with appellant's decision not to present mitigating evidence and comported with his claims of innocence. Assuming that counsel's performance was deficient, we find that appellant has failed to prove that there exists a reasonable probability that the result would have been different had counsel made a closing argument against the death sentence. We note that the state did not present any compelling arguments in support of imposing a death sentence. Rather, the

state waived opening and made a brief closing argument, asking only that the jury impose the "maximum sentence."

{¶ 111} Appellant also asserts counsel was ineffective for failing to object to the court's instruction to the jury on all statutory mitigating factors. However, we have already determined that there was no reversible error. See *State v. DePew, supra.*

{¶ 112} Finally, appellant takes issue with counsel's failure to object when the court suggested that a room could be set aside after trial for jurors who wanted to be interviewed by the press. Appellant fails to demonstrate what bearing the court's suggestion had on the outcome of his trial.

{¶ 113} In accordance with the above, we reject appellant's Proposition of Law VIII.

IV

INDEPENDENT SENTENCE REVIEW

{¶ 114} Pursuant to R.C. 2929.05, we independently weigh the aggravating circumstances against the mitigating factors and determine whether appellant's sentence is disproportionate to sentences in similar cases.

{¶ 115} The evidence supports beyond a reasonable doubt that appellant murdered Marichell, Marchae and Linda Chatman, and attempted to kill Richard Warren and Quanita and Quinton Reeves as part of a course of conduct involving the purposeful killing or attempt to kill two or more persons. R.C. 2929.04(A)(5).

{¶ 116} We find that the nature and circumstances of these offenses do not offer the slightest mitigating value. Appellant went to Marichell Chatman's apartment and ordered its occupants, Marichell, her daughter, her aunt, her two young cousins, and her boyfriend, to lie on the floor. When Marichell pleaded with appellant to spare the children, appellant replied that she should have thought of that before her brother started "ratting" on people. Ignoring Marichell's pleas, appellant fired multiple gunshots, killing three and seriously wounding the others.

Appellant then fired additional shots at Warren as Warren escaped the murder scene.

{¶ 117} Since appellant chose to waive the presentation of additional mitigating evidence, we review the presentence investigation and psychological report appellant requested and submitted to the jury. From these, we learn that appellant, thirty years old at the time of the murders, has five half-siblings whose fathers are unknown to him, and two half-siblings by his own father. He was raised by his grandparents until he was twelve years old because of his mother's youthful age. After that time, he returned to live with his mother and stepfather. He described his childhood as happy and normal.

{¶ 118} Appellant maintained a low-C average in high school, participated on the football team and completed the twelfth grade. As an adult, appellant worked several jobs, including maintenance. He has never been fired from a job.

{¶ 119} Appellant has a child who was seven years old at the time of trial and for whom he paid twenty-five dollars a week in support. During the two years prior to his arrest, appellant lived with his girlfriend, who worked at General Electric. Since his last job ended, appellant had been attempting to open an "African store" in Mansfield.

{¶ 120} Appellant described himself as someone who gets along "great" with others, "like a big teddy bear at times." He denied abusing alcohol or engaging in significant substance abuse, although he admitted smoking marijuana from the age of fifteen. At the time of his arrest, appellant had several counts of aggravated trafficking charges pending against him. In addition, appellant had a robbery and two petty theft convictions.

{¶ 121} We find that the only relevant statutory mitigating factor in this case is R.C. 2929.04(B)(7). We accord some mitigating weight to appellant's family background, work history, and personal character. Nevertheless, we find

that the aggravating circumstance of each murder count outweighs the mitigating factors beyond a reasonable doubt.

{¶ 122} We finally consider whether the penalty imposed in this case is both appropriate and proportionate when compared with similar cases. In reviewing other cases of murder as a course of conduct involving the purposeful killing or attempt to kill where we have upheld the death penalty, we find the death sentence both appropriate and proportionate in this case. Compare *State v. Hawkins* (1993), 66 Ohio St.3d 339, 612 N.E.2d 1227; *State v. Loza* (1994), 71 Ohio St.3d 61, 641 N.E.2d 1082; *State v. Frazier* (1991), 61 Ohio St. 3d 247, 574 N.E.2d 483.

Accordingly, we affirm appellant's convictions and sentence.

*Judgment affirmed.*

MOYER, C.J., DOUGLAS, RESNICK, F.E. SWEENEY, PFEIFER and LUNDBERG STRATTON, JJ., concur.

_____

APPENDIX

{¶ 123} "Proposition of Law No. I: The defendant is denied a fair trial, the effective assistance of counsel, an impartial jury, and is subjected to an unreasonable risk of cruel and unusual punishment where, subsequent to the jury's verdict on guilt, the court 1) failed to address the defendant personally in court and on the record in order to determine that he was knowingly, intelligently and voluntarily waiving his right to present mitigating evidence, 2) submitted a 'psychological evaluation' to the jury which contained misstatements of facts and law, 3) failed to advise the jury that each aggravating circumstance must be weighed against mitigating factors, 4) failed to instruct the jury that residual doubt is a mitigating factor, 5) instructed the jury on statutory mitigating factors when no evidence was introduced to establish the existence of these factors, and 6) referred to the nature and circumstances of the offense as if [they] were an aggravating circumstance.

**{¶ 124}** "Proposition of Law No. II: When the trial court gives improper preliminary instructions, repeatedly uses 'mere recommendation' language in voir dire, and improperly excuses scrupled jurors for cause without inquiry to determine substantial impairment, the defendant is denied a fair trial and a reliable sentence in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution and Article I, Sections 10 and 16 of the Ohio Constitution.

**{¶ 125}** "Proposition of Law No. III: Where identification of the accused by a witness lacks reliability and is the result of overly suggestive police identification tactics, the refusal of the trial court to suppress the witness' identification testimony violates the right of the accused to Due Process requiring reversal.

**{¶ 126}** "Proposition of Law No. IV: The trial court violated the appellant's fundamental rights to counsel and due process when it failed to make sufficient inquiry on the record of the reasons for the appellant's filing of an affidavit of indigency and request for appointed counsel and thereby forced the appellant to trial without the effective assistance of counsel in violation of the Sixth and Fourteenth Amendments to the United States Constitution and Section 10, Article I of the Ohio Constitution.

**{¶ 127}** "Proposition of Law No. V: A defendant is substantially prejudiced when a trial court allows a publication of a videotape to the jury where no foundation was laid to make the videotape admissible, the tape was not authenticated, the tape itself was not admitted into evidence but the jury was nevertheless instructed that they could consider the videotaped conversation during deliberations.

**{¶ 128}** "Proposition of Law No. VI: Where a trial court fails to remedy juror misconduct and, in fact, exacerbates certain improper influences on the jury by its own conduct an accused is denied his rights to due process and a fair trial by an impartial jury as guaranteed by the federal and state constitutions.

**{¶ 129}** "Proposition of Law No. VII:  A defendant is denied a fair and reliable sentence when the trial court and the appellate court failed to comply with the dictates of R.C. § 2929.03 by not recognizing mitigating evidence, not timely filing the sentencing opinion, and by punishing a capital defendant for speaking with the press.

**{¶ 130}** "Proposition of Law No. VIII:  Defense counsel's actions and omissions at Mr. Keith's capital trial deprived him of the effective assistance of counsel as guaranteed by the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution and Article I, Sections 9, 10 and 16 of the Ohio Constitution."