OPINION
Defendant-appellant Cheryl Wolak appeals her conviction and sentence in the Stark County Court of Common Pleas on one count of involuntary manslaughter, in violation of R.C. 2903.04; and two counts of child endangering, in violation of R.C. 2919.22(B)(2). Plaintiff-appellee is the State of Ohio.
 STATEMENT OF THE FACTS AND CASE
At approximately 2:30 a.m. on May 11, 1995, appellant placed a call to 911. The paramedics arrived at appellant's residence to find Melissa Wolak, appellant's sixteen year old daughter, unconscious and unresponsive, lying on a hardwood floor in the living room. Melissa was barely breathing and was pulseless. The paramedics noticed the house was unclean and in a state of disarray. When the paramedics asked appellant what happened, she replied Melissa had walked into the living room and fallen down.
As the paramedics began CPR, they observed burn marks on Melissa's face and hands. Initially, appellant explained the girl had fallen against the stove, but later stated Melissa had fallen against a vaporizer. While the paramedics worked on Melissa, appellant and her other children cleaned the house.
After performing CPR for approximately one-half hour, the paramedics transported Melissa to Timken Mercy Medical Center. At the hospital, Dr. Linda Caldwell and the emergency room staff continued the paramedics' efforts to resuscitate Melissa, however, those efforts were discontinued when the medical team realized their attempts were futile. Melissa was pronounced death shortly thereafter.
Due to suspicious bruises and marks on Melissa's body, physical and/or sexual abuse was feared; therefore, the Stark County Department of Human Services (hereinafter "DHS") removed the other seven Wolak children from appellant's home. The Stark County Court of Common Pleas, Juvenile Division, granted DHS temporary custody, and the children were placed in foster care. The Canton Police Department, including members of the crime lab, interviewed appellant and her husband because Melissa's death was viewed as a possible homicide.
DHS developed a case plan for reunification of the family. Upon learning she would be returning home to live with her siblings and appellant, Elaine, the oldest surviving Wolak child, began to disclose to a social worker and Dr. Robin Tener, a clinical psychologist, incidents of physical abuse perpetrated by appellant against Melissa and her. As a result of these disclosures, DHS terminated visitation between the children and appellant. On January 27, 1997, the Stark County Grand Jury indicted appellant on one count of involuntary manslaughter, in violation of R.C. 2903.04; two counts of endangering children, in violation of R.C. 2919.22(B)(2); one count of felonious sexual penetration, in violation of R.C. 2907.12; one count of gross sexual imposition, in violation of R.C. 2907.05; and one count of endangering children, in violation of R.C. 2919.22(A).[1] At her arraignment on January 31, 1997, appellant plead not guilty. A jury trial commenced on April 21, 1997.
At trial, Elaine Wolak testified regarding appellant's treatment of Melissa and her. Elaine recalled appellant locking Melissa and her in a small room in the basement, known as "the rodent room", for extended periods of time. The room had no windows. Elaine testified she never knew the time of day when she was confined in the room. The only light in the room emanated from a single light bulb hanging from the ceiling. Although the room had no heat and contained no furniture, appellant forced Elaine and Melissa to sleep there without pillows or blankets. Elaine explained she and her sister would snuggle together, standing close to the hanging light bulb in an attempt to keep warm.
When Elaine and Melissa needed to use the bathroom, appellant would have one of the other siblings escort the girls to the bathroom for a designated amount of time, usually to the count of ten. Their other options were to relieve themselves in a hole in the floor of the rodent room or urinate on themselves. If Melissa and Elaine soiled themselves, appellant or Michelle[2], at appellant's command, would spray the girls off with a hose. Appellant would then return Melissa and Elaine to the rodent room, soaking wet and with no towels. On other occasions, appellant would force the girls to lick the urine off the basement floor. Because appellant deprived Melissa and Elaine of food for extended periods of time while in they were in the basement, the girls punctured holes in aluminum cans of food in order to drink the liquid.
Elaine recounted numerous other types of abusive punishment inflicted upon her and her sister by appellant. Appellant often ordered Michelle to pound Elaine's and Melissa's feet with cans of food. Appellant also forced the girls to swallow handfuls of laundry detergent. Other punishment endured by the girls included performing an extensive number of deep knee bends and back bends.
Additionally, Elaine described the night of Melissa's death and the days preceding it. Elaine recalled Melissa's illness began with typical flu symptoms — cough, earache, sorethroat, and headache. Over time, Melissa's illness progressed to the point the girl was unable to talk, walk, and stay awake. Appellant did not seek medical attention for Melissa. Approximately 10:00 p.m. on May 10, 1995, appellant locked Melissa and Elaine in the rodent room. At midnight, appellant allowed the girls out of the basement. Michelle and Elaine dragged Melissa upstairs and laid her on the dining room floor. At 2:00 a.m., appellant ordered Michelle and Elaine to take Melissa upstairs and bathe her. After dragging Melissa upstairs, Michelle and Elaine undressed her, placed her in the bathtub, and bathed her. Melissa was gasping for air. The girls carried Melissa downstairs and laid her on the living room floor. Appellant called 911. The other children were awaken and instructed to clean the house.
Elaine also testified to the sexual abuse she suffered at the hands of appellant. Elaine recalled the abuse began when she was five years old and continued until she was fourteen years old.
In addition to Elaine, four other Wolak children testified at appellant's trial. Michelle Wolak testified appellant would punish all of the children "for doing wrong things", however, she admitted appellant punished Melissa and Elaine more severely than the other children. Michelle also admitted she pounded Elaine's and Melissa's feet with cans of food. She recalled doing such an act at appellant's command.
Michelle also recalled the events surrounding the night of Melissa's death. On that evening, appellant instructed Michelle and Elaine to take Melissa upstairs and give her a bath. Michelle and Elaine carried Melissa because she could not walk on her own. After bathing Melissa, Michelle dressed her sister. At this point, Melissa was gasping for air. Michelle and Elaine carried Melissa downstairs to the living room, where they placed her on the floor. Appellant called 911. Thereafter, Michelle and Elaine woke the rest of the children with instructions from appellant to start cleaning the house. At the end of her direct examination, Michelle acknowledge her love for appellant and her desire to return home with appellant. Emily Wolak[3], Connie Wolak[4], and Cole Wolak[5] similarly testified regarding how appellant ran the household and appellant's treatment of Melissa and Elaine.
Robin Tener, Clinical Director of Northeast Ohio Psychological Associates, testified regarding her relationship with the Wolak family. DHS had referred the children for psychological assessment after their removal from their parents' home. In June, 1995, Dr. Tener personally interviewed and tested Elaine, Michelle, and Emily. After her initial contact with the children, the doctor did not see them for therapy. Approximately six months later in December, 1995, Dr. Tener met appellant for assessment purposes. Appellant told Dr. Tener she could recall only a small portion of Melissa's life and had no memories of Melissa as a baby.
Subsequently, in July, 1996, Dr. Tener again saw Elaine. The doctor testified Elaine was having difficulties with depression, suicidal ideation, and obsessive thoughts about death. Dr. Tener recalled, during the course of her meetings with Elaine, the girl began to disclose additional details about her family life and the abuse she and Melissa suffered at the hands of appellant. As a result of these disclosures, Dr. Tener again met with Michelle and Emily. The two younger girls also disclosed to Dr. Tener the abuse perpetrated by appellant against Elaine and Melissa.
Dr. Linda Caldwell, the emergency room physician on call the morning Melissa was brought to the hospital, testified regarding Melissa's condition upon her arrival at the emergency room. During her testimony, Dr. Caldwell concluded Melissa had been in septic shock for a very long time. The doctor based this conclusion on the fact Melissa's body temperature was 86.5 degrees. Dr. Caldwell explained septic shock occurs when an infection becomes so advanced the effected organ becomes disseminated into the blood system and produces toxins. Septic shock causes paralysis of the cellular system. In other words, the body of an individual in septic shock is unable to metabolize, use glucose, use energy, or use any other function to sustain life.
Dr. James Pritchard, the Stark County Coroner, and Dr. Richard Steiner, an attending physician and Medical Director at Childrens' Hospital Medical Center of Akron, testified regarding their diagnoses as to the cause of Melissa's death. Dr. Pritchard testified he concluded the cause of Melissa's death was bilateral bronchonpneumonia due to Parainfluenza Type 3 and staphylococcus arues with intravascular coagulation. He noted a contributing factor was hypothermia. Both Dr. Steiner and Dr. Pritchard explained Parainfluenza Type 3 is a common virus and staphylococcus arues is a common infection, both of which are easily treatable. The doctors noted it was extremely rare for an individual to die from these ailments. Dr. Steiner opined Melissa would have recovered from her infection if she had received routine medical treatment. Dr. Steiner testified Melissa would have been critically ill for the entire day before her death, and unconscious for the last eight to twelve hours of her life.
Although Dr. Pritchard originally ruled Melissa's death "natural", he explained he had several concerns regarding his ruling based upon the information he had at the time and Melissa's condition at her death. As a result of a letter he received from Dr. Steiner, information received from DHS and the Northeast Ohio Psychological Association, an additional review of the autopsy report, and Dr. Caldwell's report, the Coroner changed his opinion as to the manner of death. At the time of trial, Dr. Pritchard testified he changed his ruling to a "homicide."
Appellant did not testify at trial, but called two witnesses: Jared Kovalik, her eleven year old nephew, and Larry Wright, a long time friend. Both witnesses testified they had spent a substantial amount of time at appellant's home and never witnessed any signs of abuse of the children. Wright also testified he was aware Melissa was sick for an extended period of time prior to her death.
After hearing the evidence and deliberations, the jury found appellant guilty of involuntarily manslaughter, and the two felony counts of endangering children. The jury acquitted appellant of the charges of felonious sexual penetration and gross sexual imposition, as well as the misdemeanor child endangering count. Upon accepting the jury's verdicts, the trial court sentenced appellant to an indefinite term of imprisonment of ten to twenty-five years on the involuntarily manslaughter count, five to fifteen years on the second degree felony count of endangering children, and an indefinite term of not less than two years on the third degree felony count of endangering children. The trial court ordered the sentences run consecutively to each other.
It is from this conviction and sentence appellant prosecutes this appeal raising the following assignments of error:
 I. THE JUDGMENT OF CONVICTION OF THE TRIAL COURT AND VERDICT OF THE JURY AS TO THE CHARGES IN THE INDICTMENT WERE AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.
 II. THE APPELLANT WAS DENIED HIS [SIC] RIGHT TO DUE PROCESS AND A FAIR TRIAL BY THE TRIAL COURT'S FAILURE TO VOIR DIRE THE JURORS AND/OR CAUTION THEM REGRADING STATEMENTS MADE BY REPLACED JUROR NO. 7, AND FURTHER WAS DENIED EFFECTIVE REPRESENTATION BY COUNSEL'S FAILURE TO RAISE THIS ISSUE.
 III. THE SENTENCING OF THE DEFENDANT TO CONSECUTIVE SENTENCES ON THE CONVICTIONS OF COUNTS I, II AND III BY THE TRIAL COURT WAS ERROR.
 I
In her first assignment of error, appellant asserts the jury's verdicts were against the manifest weight of the evidence.
On review for manifest weight, a reviewing court is to examine the entire record, weigh the evidence and all reasonable inferences, consider the credibility of the witnesses and determine whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction. State v. Thompkins (1997),78 Ohio St.3d 380, 387 citing State v. Martin (1983), 20 Ohio App.3d 172,175. Because the trier of fact is in a better position to observe the witnesses' demeanor and weigh their credibility, the weight of the evidence and the credibility of the witnesses are primarily for the trier of fact. State v. DeHass
(1967), 10 Ohio St.2d 230, syllabus 1.
In support of her arguments, appellant refers to the testimony of three witnesses — Elaine Wolak, Dr. Caldwell, and Dr. Pritchard — which she asserts does not support the convictions. First, appellant contends Elaine Wolak's testimony lacks credibility. Appellant explains the lack of credibility is evidenced by the fact Elaine's responses during cross-examination were mostly denials and a series of "I don't remembers", and many of her allegations were shown to be false through the testimony of other witnesses. Second, appellant submits Dr. Caldwell's testimony regarding the length of Melissa's illness is contradicted by Dr. Steiner's testimony regarding the same. Appellant explains Dr. Steiner concluded Melissa was not ill for as long a period of time as Dr. Caldwell testified the girl was ill, and this shortened time frame is consistent with her version of the events leading up to Melissa's death. Because Dr. Steiner is more qualified in the area of medicine dealing with the illness and bacteria which killed Melissa, appellant infers the jury should have given his testimony more weight.
Third, appellant asserts Dr. Pritchard's testimony regarding his change of ruling on the cause of Melissa's death from "natural" to "homicide" was based, in part, on inaccurate and incomplete information. Appellant submits Dr. Pritchard's failure to take into account all the available information made his change in ruling faulty.
At trial, the Wolak children corroborated to a great extent the testimony of Elaine. Michelle Wolak admitted her own participation in appellant's abuse of Elaine and Melissa. Although Elaine testified she was sexually abused by appellant, the other evidence presented at trial did not support this allegation. The jury acquitted appellant of the counts of felonious sexual penetration and gross sexual imposition.
Dr. Tener detailed the evolution of Elaine's disclosures regarding appellant's abuse. Dr. Tener explained Elaine did not disclose this information immediately because she feared experiencing rejection from appellant. The doctor noted she saw many abused children who wanted to please their parents and, consequently, blamed themselves for the abuse they endured. Dr. Tener further stated the children's failure to fully and completely disclose all of the abuse does not, in and of itself, indicate they are not telling the truth about the abuse.
Although Dr. Caldwell and Dr. Steiner may have offered different opinions as to the length of Melissa's illness, both doctors testified Melissa's condition did not occur instantaneously and progressed over a period of time. The doctors also agreed Melissa went into septic shock as a result of the progression of her illness.
Upon our review of the record and the facts set forth supra,
we find the jury did not clearly lose its way so as to result in a manifest miscarriage of justice. The trier of fact was free to except or reject all or any part of the testimony of the witnesses and assess the credibility of those witnesses. Despite some discrepancy among the testimony of the witnesses, the record contains sufficient evidence to support the verdicts.
Appellant's first assignment of error is overruled.
 II
In her second assignment of error, appellant maintains she was denied her right to due process and a fair trial as a result of the trial court's failure to voir dire the entire jury panel and/or caution them regarding the statements made by removed Juror No. 7. Additionally, appellant contends she was denied effective representation as a result of trial counsel's failure to raise this issue.
"When possible juror misconduct is brought to the trial judge's attention he has a duty to investigate and to determine whether there may have been a violation of the sixth amendment."State v. Rudge (1993), 89 Ohio App.3d 429, 442 (Citations omitted). "Since the trial judge is in the best position to determine the nature and extent of alleged jury misconduct, his decision on the scope of proceedings necessary to discover misconduct is reviewed only for an abuse of discretion." Id.
(Citations omitted). An abuse of discretion connotes more than error of law or of judgment; it implies that the court's attitude is unreasonable, arbitrary or unconscionable. State v. Adams
(1980), 62 Ohio St.2d 151, 157.
The Ohio Supreme Court recently "reaffirmed a long-standing rule that a court will not reverse a judgment based upon juror misconduct unless prejudice to the complaining party is shown."State v. Keith (1997), 79 Ohio St.3d 514, 526 (Citations omitted).
In the instant action, the trial court's bailiff was approached by a juror during the lunch break on the fifth day of trial. After lunch, the bailiff reported the incident to the trial court:
 THE BAILIFF: It is either Juror 12 or 7, I am not sure which one. I will have to get his number. But as we were leaving after lunch and took them back, he looked over to me and he said I take it I am not allowed to have an opinion on this yet.
 I said you must follow the Court's instructions, whatever the Court told you is what you must follow. He goes, well, this is bullshit and he left.
 THE COURT: That was said in front of the other jurors?
 THE BAILIFF: That was said in front of the other jurors.
THE COURT: The other jurors' reactions?
 THE BAILIFF: They were taken back by it, that he had actually said something by it. It is not unusual to get grumblings about things dragging on or getting through a witness; but I didn't know how to take this comment, and I thought I needed to report it.
Transcript of the Proceedings, Vol. V., pp. 1112-1113.
Upon learning of the incident, the trial court conducted a voir dire examination of Juror No. 7. The trial court presented Attorney Richard Drake, appellant's trial counsel, and the prosecutor with an opportunity to question Juror No. 7. The following dialogue transpired:
 THE COURT: You are Juror No. 7. Under the law the Bailiff is always obligated to, anytime a juror makes a comment the Bailiff is required to report that to the Court.
 My understanding is that you made a comment relative to the proceedings and it was in the presence of other jurors. I didn't know the basis of what the comment was or things intended by that. That is why we have you here just to inquire.
 JUROR NO. 7: First of all, obviously the comment was inappropriate. I realize I should not have said that.
 I think that I was a little bit upset at the time because I felt that some of what I perceived was about to occur was unnecessary and irrelevant. I believe that the questions had been asked and answered sufficiently.
* * *
 THE COURT: * * * The main thing that we are concerned about is the fact that sometimes, whether that will influence your decision whatsoever, can you in effect listen to all the evidence and the instructions of the law and then enter into deliberations with all of that.
JUROR NO. 7: Absolutely. It has no effect on that.
THE COURT: Okay, any questions by either counsel?
MR. DRAKE: What was the comment that you made, sir?
 JUROR NO. 7: I honestly don't remember my exact words, but it was something to the effect that I thought it was ridiculous. I think I just said that it was ridiculous. I honestly don't remember my exact words.
 I really think there is no explanation or no reasoning or justification to the rest of the jury why I made those comments.
 MR. DRAKE: The Bailiff reportedly said that you said something like this is bullshit.
JUROR NO. 7: I may have.
 MR. DRAKE: Again, what did you mean? Did the other jurors hear this?
 JUROR NO. 7: I assume so. I said it in the room back here. I don't know how many jurors were present at the time. They were beginning to file out for lunch.
MR. DRAKE: Did anyone look at you or respond to you?
 JUROR NO. 7: I was directing my comments more towards the Bailiff.
* * *
 MR. DRAKE: Did you talk to any other jurors about this, or have they asked you anything about it?
 JUROR NO. 7: There were questions as to what I meant and I told them — you can poll every one of them if you like — that I realize I can't discuss it and it is irrelevant. There has been no discussion about this at all.
 MR. DRAKE: When did they ask you questions about what you meant?
 JUROR NO. 7: While we were at lunch, there was some questioning about what —
THE COURT: But at least you didn't respond.
 JUROR NO. 7: Absolutely — I realized it was wrong. I realized that immediately, yes.
* * *
 JUROR NO. 7: I can absolutely be fair and impartial. Those feelings have no bearing on listening to the evidence and where it might eventually go. It had none at all whatsoever.
 More of a feeling of frustration, I think, over lack of control, the time elements, those of kind of things. It has nothing at all to do with where the case might go from here.
* * *
 THE COURT: Would it be a correct statement in fact as far as your opinion is concerned that that just relates to [the coroner's] testimony and not as to the overall picture in forming early conclusions?
 JUROR NO. 7: As to his testimony this morning, there is nothing else that has happened this week that has anything to do with that.
Tr. (V), pp. 114-1112.
The trial court granted Attorney Drake's request for removal of Juror No. 7 and replaced him with an alternate. Attorney Drake did not request the trial court to voir dire the remaining jurors. The trial court commented, because Juror No. 7 never responded to the other jurors' questions regarding his remark, the fact the other jurors asked questions to Juror No. 7 was insignificant. When the court reconvened the following Monday, appellant and the State jointly requested the trial court to voir dire the entire panel. The trial court denied this request.
Although we find the better approach would have been for the trial court to voir dire the entire jury panel, we find the trial court did not abuse its discretion in failing to do so, given the responses from Juror No. 7 noted supra.
We now turn our attention to appellant's claim of ineffective assistance of counsel predicated upon Attorney Drake's failure to request a cautionary instruction relating to Juror No. 7's statement.
A claim of ineffective assistance of counsel requires a two-prong analysis. The first inquiry is whether counsel's performance fell below an objective standard of reasonable representation involving a substantial violation of any of defense counsel's essential duties to the appellant. The second prong is whether the appellant was prejudiced by counsel's ineffectiveness.Lockhart v. Fretwell (1993), 113 S.Ct. 838, 122 L.Ed.2d 180;Strickland v. Washington (1984), 466 U.S. 668, 104 S.Ct. 2052,80 L.Ed.2d 674; State v. Bradley (1989), 42 Ohio St.3d 136.
In determining whether counsel's representation fell below an objective standard of reasonableness, judicial scrutiny of counsel's performance must be highly deferential. Bradley, supra,
at 142. Because of the difficulties inherent in determining whether effective assistance of counsel was rendered in any given case, a strong presumption exists that counsel's conduct fell within the wide range of reasonable, professional assistance. Id.
In order to warrant a reversal, the appellant must additionally show he was prejudiced by counsel's ineffectiveness. This requires a showing that there is a reasonable probability, but for counsel's unprofessional errors, the result of the proceeding would have been different. Id. at paragraph three of the syllabus. A reasonable probability is a probability sufficient to undermine confidence in the outcome. Id.
The United States Supreme Court and the Ohio Supreme Court have held a reviewing court "need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies." Id. at 143, quoting Strickland v. Washington, supra, at 697. Accordingly, we will direct our attention to the second prong of the Strickland test and examine whether Attorney Drake's omission prejudiced appellant.
Based upon the trial court's voir dire of Juror No. 7, as set forth in pertinent part supra, wherein we found the trial court did not abuse its discretion in refusing additional voir dire of the remaining jurors because it found no evidence the jury was tainted by the offending juror's remark, and in light of the evidence presented at trial, as set forth in the Statement of the Facts and Case supra, we find appellant is unable to show there is a reasonable probability the result of her trial would have been different, but for Attorney Drake's failure to request a cautionary instruction.
Appellant's second assignment of error is overruled.
 III
In her third assignment of error, appellant maintains the trial court erred in ordering the sentences for her three convictions to run consecutively to each other. Specifically, appellant asserts count one, involuntary manslaughter[6], and count two, endangering children[7], are allied offenses of similar import. Additionally, appellant argues the trial court erred in ordering the sentences on the three counts be served consecutively because the aggregate minimum term of her consecutive sentences exceeds the statutory limits set forth in R.C. 2929.41. Brief of Defendant-Appellant, at 24.
R.C. 2941.25 provides:
 (A) Where the same conduct by defendant can be construed to constitute two or more allied offenses of similar import, the indictment or information may contain counts for all such offenses, but the defendant may be convicted of only one.
 (B) Where the defendant's conduct constitutes two or more offenses of dissimilar import, or where his conduct results in two or more offenses of the same or similar kind committed separately or with a separate animus as to each, the indictment or information may contain counts for all such offenses, and the defendant may be convicted of all of them.
Interpreting this statute, the Ohio Supreme Court held, inNewark v. Vazirani (1990), 48 Ohio St.3d 81, a two-tiered test must be undertaken to determine whether two or more crimes are allied offenses of similar import. Newark, supra, at syllabus. In the first step, the elements of the two crimes are compared.Id. If the elements of the offenses correspond to such a degree the commission of one crime will result in the commission of the other, the crimes are allied offenses of similar import and the court must then proceed to the second step. Id.
In the second step, the defendant's conduct is reviewed to determine whether the defendant can be convicted of both offenses.Id. If the court finds either the crimes were committed separately or there was a separate animus for each crime, the defendant may be convicted of both offenses. Id. See also: Statev. Blankenship (1988), 38 Ohio St.3d 116, 117. Applied in: Statev. Gummere, Licking App. No. 96CA45, unreported; State v. Hunt, Licking App. No. 95CA137, unreported.
In her Brief to this Court, appellant claims the State presented the same witnesses, who testified about the same conduct, to support the three counts upon which appellant was convicted. Appellant explains because the indictment charges she acted in a "continuous course of conduct" over a specified period of time, this fact indicates the same purpose or animus for all three counts.
Although counts one and two identify Melissa Wolak as the victim, the underlying felony of endangering children upon which the involuntary manslaughter conviction was predicated involved a violation of a different section of the endangering children statute from the felony endangering children in count two. The underlying endangering children offense in count one was based upon a violation of R.C. 2919.22(A), which provides "[n]o person, who is the parent, * * * of a child under 18 years of age * * *, shall create a substantial risk to the health or safety of the child, by violating a duty of care, protection, or support." In count two, appellant was charged with endangering children, in violation of R.C. 2919.22(B)(2), which provides "[n]o person shall doing any of the following to a child under 18 years of age * * * torture or cruelly abuse the child."
Extensive evidence was presented at trial to establish appellant failed to seek medical attention for Melissa despite the fact the girl's illness progressed to the point she could not talk and walk, and did nothing except sleep. Both Dr. Pritchard and Dr. Steiner testified any reasonable person would have sought medical treatment for a child in Melissa's state and the failure to do so resulted in her death. Separate and distinct from this evidence was the evidence of the continuous torture and abuse Melissa suffered at the hands of appellant. These acts of abuse, as detailed supra, were committed separately from and involved a separate animus from appellant's violation of her duty of care to Melissa.
Because we find the crimes were committed separately and there was a separate animus for each, we find counts one and two are not allied offenses of similar import. Accordingly, we find the trial court did not err in ordering the sentences on the two counts to be served consecutively to each other.
We now turn our attention to appellant's claim the trial court erred in ordering her sentences on all three counts to be served consecutively to each other because the aggregate minimum term of imprisonment exceeds the statutory limits set forth in R.C. 2929.41.
R.C. 2929.41(E) provides, in pertinent part:
 Consecutive terms of imprisonment imposed shall not exceed:
* * *
 (2) An aggregate minimum term of fifteen years * * * when the consecutive terms imposed are felonies other than aggravated murder or murder.
A review of the record in this case reveals appellant's three sentences total seventeen to forty-two years, two years over the statutory aggregate minimum.
In State v. White (1985), 18 Ohio St.3d 340, 341, the Ohio Supreme Court found:
 [W]here a trial court's sentence exceeds the minimum established for consecutive terms, such judgment is not the basis of a reversible error, as the terms of former R.C. 2929.41(E)(2), now (E)(3), are self-executing, automatically operating to limit the aggregate minimum sentencing term to fifteen years.
Although appellant's sentence exceeds the statutory aggregate minimum for consecutive terms, we find the trial court's ordering appellant to serve an aggregate minimum in excess of the statutory term is not reversible error because the terms of R.C. 2929.41(E) are self-executing.
Appellant's third assignment of error is overruled.
The conviction and sentence of the Stark County Court of Common Pleas is affirmed.
By: Hoffman, J., Gwin, P.J. and Wise, J. concur.
[1] Appellant's husband, Michael Wolak, was also indicted in the same case on one count of involuntary manslaughter, in violation of R.C. 2903.04; and three counts of endangering children, in violation R.C. 2919.22. Michael Wolak plead guilty as charged and was sentenced to an aggravate term of five to twenty five years.
[2] Michelle, who was fifteen years old at the time of appellant's trial, is the third oldest child.
[3] Emily, who was thirteen years old at the time of the trial, is the fourth Wolak child.
[4] Connie, who was a week shy of her twelfth birthday at the time of the trial, is the fifth Wolak child.
[5] Cole, who was ten years old at the time of the trial, is the sixth Wolak child.
[6] R.C. 2903.04.
[7] R.C. 2919.22(B)(2), a second degree felony.
For the reasons stated in our accompanying Memorandum-Opinion, the judgment of the Stark County Court of Common Pleas is affirmed. Costs assessed to appellant.