DECISION AND JUDGMENT ENTRY
This is an appeal from (1) a January 21, 1998 judgment entry of the Lucas County Court of Common Pleas in which the court accepted jury verdicts finding appellant, Andrew Mierzejewski, guilty of complicity to commit murder, a violation of R.C. 2903.02, and guilty of complicity to commit attempted murder, a violation of R.C. 2903.02 and R.C. 2941.145, and gun specifications for each count and sentenced appellant for those crimes; and (2) a November 24, 1998 judgment entry of the Lucas County Court of Common Pleas in which the court denied a motion for a new trial or a modification of the jury verdict filed by appellant pursuant to Crim.R. 33. Appellant has presented three assignments of error for consideration that are:
"Assignment of Error No. 1:
 THE TRIAL COURT ERRED IN OVERRULING APPELLANT'S MOTION FOR NEW TRIAL BASED ON A SLEEPING JUROR.
"Assignment of Error No. 2:
 APPELLANT'S CONVICTION WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.
"Assignment of Error No. 3:
 PROSECUTORIAL MISCONDUCT DURING CLOSING ARGUMENT DEPRIVED APPELLANT OF A FAIR TRIAL, AND THE FAILURE TO OBJECT CONSTITUTED INEFFECTIVE ASSISTANCE OF COUNSEL."
We begin by considering the second assignment of error first.
Appellant argues, in support of his second assignment of error, that his convictions as a complicitor to murder and attempted murder are against the manifest weight of the evidence. He points to two "problems" with the theory that he is a complicitor because he allegedly said "Do `em up" before the person who actually shot two young men driving away from a party in their car, killing one and wounding the other, pulled the trigger on the gun. First, he says that even if he said "Do `em up" there is compelling evidence that a second individual, Michael Billegas ("Billegas"), also spoke the same or similar words before the shooting took place. Second, he says there is no evidence to show that the shooter heard his statement and acted on the directive. Instead, he says, the shooter testified at trial that he did not hear appellant speak, and that he only heard Billegas speak before he shot the two victims in this case. Appellant argues in his brief: "If Billegas said the fateful words, whether or not appellant also said them, there is absolutely no evidentiary basis on which the jury could have concluded that [the shooter] heard and acted on appellant's rather than Billegas's words. And if [the shooter] did not hear or act on what appellant said, then there is no causal relationship, no nexus other than coincidence, between appellant's words and the shooting." He argues that this court should find that the jury clearly lost its way when it found appellant guilty of the complicity charges.
Appellee, the state of Ohio, responds that it is clear that a rational trier of fact could find from the evidence presented in this case that all the essential elements of the crimes of complicity to commit murder and complicity to commit attempted murder were proved beyond a reasonable doubt. Appellee acknowledges that there was contradicting evidence. However, appellee argues that the jury in this case clearly concluded that the witnesses presented by the state, who testified that appellant made a directive statement before the shooter pulled the trigger on his gun, were credible and that the witnesses presented by appellant in his defense who said appellant made no directive statement were not credible. Finally, appellee says that even if appellant never said directive words before the shooting took place, his act of driving the shooter away from the scene of the murder was by itself aiding and abetting and supports his conviction as a complicitor.
The Supreme Court of Ohio has said:
 "Weight of the evidence concerns `the inclination of the greater amount of credible evidence, offered in a trial, to support one side of the issue rather than the other. It indicates clearly to the jury that the party having the burden of proof will be entitled to their verdict, if, on weighing the evidence in their minds, they shall find the greater amount of credible evidence sustains the issue which is to be established before them. Weight is not a question of mathematics, but depends on its effect in inducing belief.' * * * Black's, supra, at 1594.
 "When a court of appeals reverses a judgment of a trial court on the basis that the verdict is against the weight of the evidence, the appellate court sits as a `thirteenth juror' and disagrees with the factfinder's resolution of the conflicting testimony. * * *" State v. Thompkins (1997), 78 Ohio St.3d 380, 387.
Furthermore, the Supreme Court of Ohio has stated that it is the function of a jury, not an appellate court, to determine the credibility of a witness. State v. Kehn (1977), 50 Ohio St.2d 11, 14. Keeping these standards of review in mind, we have reviewed the record.
The record shows that there is no dispute that on the evening of April 4, 1997, appellant helped two other friends, including the friend who eventually shot the two victims in this case, to plan and prepare a cookout. The cookout was held at the home of the shooter's mother. Several people were invited and many accepted the invitation to attend the cookout. Included in those who attended the cookout were some young women, who invited the two young men who were eventually the victims in this case to go to the cookout with them.
The shooter testified that beginning at noon, he snorted cocaine several times, smoked several joints of marijuana and drank beer. Appellant also admitted to drinking alcohol and smoking marijuana. The two victims drank beer that evening.
Guests started arriving at the cookout between 6:00 p.m. and 6:30 p.m. The victims and the young women who invited them arrived at the cookout sometime after 10:00 p.m. While some of the young women knew appellant and the shooter, neither of the young men who came with the young women knew appellant or the shooter prior to that evening.
During the beginning of the party, guests were in the front yard, inside the house and in the back yard. When the mother of the shooter arrived home, she was upset at the noise and the mess, so she directed everyone to move to the backyard.
After all the guests were in the backyard, the younger brother of the shooter, who was eleven years old at the time, began to move back and forth between appellant and one of the victims. Appellant and the eventual victim were standing at opposite ends of the yard, but the younger brother of the shooter kept moving from one to the other saying that appellant said derogatory remarks about the victim and visa versa. Eventually, there was a direct verbal confrontation between appellant and the victim. During the verbal altercation, the shooter came out of his house with a gun in his hand. He offered the gun to appellant, but appellant did not accept the gun. He told the shooter to put the gun away. Shortly thereafter, several of the women at the party, including the shooter's mother, asked the two victims to leave.
The two victims complied with the request to leave. They had to walk through a narrow opening from the backyard between the shooter's mother's house and the house next door. They went directly to the car of one of the victims. Most of the other guests from the party followed them, including appellant. Several of the guests were yelling at the two victims.
As the victim who was driving the car pulled away from the curb and began driving down the street past the house where the cookout had been held, the shooter came down the steps of the house, stood in front of the car near the driver's side fender, pulled his gun and fired six shots. One bullet struck the driver in the head, causing immediate, massive brain injury that caused him to die within minutes. The passenger in the car was struck by a bullet that went completely through his thigh. The passenger managed to stop the car. He held his dying friend's head in his lap until the paramedics arrived.
Appellee presented the testimony of three young women who were present at the cookout when the shooting took place. The first young woman said she had known the shooter for two or three weeks before the cookout. She was one of the young women who took the two victims to the cookout. She witnessed the verbal altercation between appellant and one of the victims. She testified that she followed the two victims to the street because she knew they were unfamiliar with the area and she was going to give the driver directions. She was standing in front of the victims' car, between her car and the victims' car trying to get the driver's attention so she could give him directions on how to leave. She said appellant and his friend Billegas were four feet away from her. She testified that as the victims' car pulled away from the curb, she heard appellant yell "Do `em up, Rick." She turned, looked at appellant and saw as well as heard him yell the directive phrase a second time. She testified that Billegas might have yelled an echo, but she was not sure whether or not Billegas yelled.
Appellee's second witness was a young woman who knew appellant for seven years from high school. She knew appellant, but did not know the victims. She testified that she was located between the shooter's house and the house next door, about five feet from the front of the shooter's house when she heard appellant yelling "Do `em up, Rick. Do `em up." She testified that she recognized appellant's voice. After she heard him yell, she heard shots being fired. When she reached the front yard, she saw appellant driving away from the scene in his car, with the shooter riding in the backseat of the car. She ran to help the victims, and got a passing motorist to stop and to call 911.
The third witness called by appellee was a young woman who was invited to the cookout by appellant. She was one of the young women who brought the two victims to the cookout. She testified that she was standing right next to appellant in the front yard when everyone followed the victims to their car. She heard appellant, his friend Billegas and a third young man she did not know yell "Do him up, Rick. Do him up."
Appellant called several witnesses on his behalf. His first witness was a young man who was a friend of appellant and of Billegas. He was invited to the cookout by appellant. He testified that he was standing a few feet from the front porch of the shooter's house when he heard Billegas yell "Handle that." He then saw the shooter draw a gun and shoot the victims. He said he did not see appellant anywhere in the front yard when the directive was yelled and the shooter responded.
The second witness called by appellant was a young man who was appellant's friend. He said he followed the victims, appellant and Billegas from the back yard to the front yard. He said while appellant argued with one of the victims in the back yard, Billegas took the argument up as the victims were leaving. He said he was standing just in the front yard when Billegas alone yelled to the shooter to "do that" or to "handle it" before the shooter shot the victims. He said he did not see or hear appellant do anything to direct the shooter to shoot.
Appellant's next witness said she stayed in the back yard. She did not hear any directive statements made by anyone.
Appellant's fourth witness, a friend of appellant, the shooter and Billegas, said he was standing between the shooter's house and the house next door. He was about a fourth of the way from the back yard to the front yard when he heard people yell directions to shoot. He said he did not recognize any of the voices.
Appellant's fifth witness was his girlfriend. She started dating appellant after the incident that led to the charges in this case. She testified that when the victims left the back yard, she went through the house to the front yard. She said she heard loud talking and saw the shooter shoot, but she did not identify who the loud talkers were.
The sixth witness called by appellant was a male friend of appellant, the shooter and Billegas. He said he was standing in the neighbor's front yard when he heard Billegas say to "do him in". He said he then heard appellant yell "No." Then he saw the shooter shoot, and he fled the scene.
Appellant next introduced into evidence the statement Billegas made when he entered a guilty plea to a charge of inciting violence. Billegas asserted his Fifth Amendment privilege against self-incrimination and refused to testify in appellant's case because Billegas could still be prosecuted for complicity to murder and attempted murder. When he pleaded guilty to inciting violence, Billegas told the court, under oath, that the victims were leaving the cookout and: "As they were leaving, there was a lot of shouting going on, about do them up or shoot them up, and I also yelled." He admitted that he yelled "Do them up" meaning that the shooter should shoot the victims.
The shooter testified. He said that he heard only Billegas yell to shoot the victims before he pulled his gun and shot. On cross-examination, he admitted that he and Billegas sold drugs together. He also acknowledged that he wrote a letter to Billegas from jail telling Billegas he did not hear Billegas say anything before he shot the victims. He testified that he was telling Billegas in code that he would not testify against Billegas, and that he would take all the blame for himself.
Finally, appellant testified. He said that he tried to stop the shooter from shooting by yelling "No" after other told the shooter to shoot.
The record clearly shows that there was conflicting evidence presented regarding whether or not appellant made a directive statement encouraging the shooter to pull the trigger and shoot the victims in this case. However, we agree with appellee that the jurors in this case could reasonably conclude that the testimony presented by appellant's witnesses was not credible.
The shooter admitted on the stand that he was willing to lie for his friend Billegas and to take the responsibility for himself. The jury could have concluded that the shooter was likewise willing to lie for appellant, and that he could easily place the blame only on Billegas because Billegas had already admitted in court that he did yell for the shooter to shoot the victims. One witness called by appellant said he did not even see appellant in the front yard when the yelling and shooting took place; yet appellant himself admitted that he was present. One witness said she never heard any yelling at all. Another admitted he heard yelling, but he could not identify any of the voices.
Conversely, the two witnesses presented by appellee who were in the front yard both heard appellant yell a directive to shoot the victims before the shooter shot. One of those witnesses was sure Billegas also yelled, and the other thought Billegas might have yelled, but she was not sure. The statement made by Billegas that was admitted into evidence by appellant indicated that he did yell and that he was not the only one yelling for the victims to be shot.
The third witness presented by appellee did not hear Billegas yell, but she was not in the front yard. Furthermore, she could identify appellant as a speaker without seeing him yell because she knew him for seven years and recognized his voice.
We therefore conclude, based upon a thorough review of all of the evidence in this case, that the jury did not lose its way in this case. Appellant's convictions are not against the manifest weight of the evidence, and his second assignment of error is not well-taken.
In support of his first assignment of error, appellant argues that the trial court erred when it denied his motion for a new trial. He says that he presented clear evidence of juror misconduct to the trial court. Specifically, he argues that he presented the affidavit of a witness who saw a male juror with his head down and eyes closed when the shooter was on the stand testifying. He acknowledges that the trial court's "generic proposition" that he had the burden to prove the misconduct caused him prejudice. He argues that in this case he "has done all that he can be asked to do." He says he provided the trial court with evidence to show that a juror was sleeping during the testimony of the shooter, which was a critical portion of the trial. He says that the shooter absolved appellant of any responsibility when he testified that he did not hear appellant yell and that he did not follow any directive from appellant when he shot the victims. He asks that this case be remanded for an evidentiary hearing to determine whether the juror was actually asleep. He says that if the juror was asleep, he should be granted a new trial.
First, we note that, generally, a trial court's ruling on a motion for a new trial filed pursuant to Crim.R. 33 will only be reversed on appeal if the trial court abused its discretion. State v. Schiebel (1990),55 Ohio St.3d 71, paragraph one of the syllabus. An abuse of discretion "connotes more than an error of law or judgment; it implies that the court's attitude is unreasonable, arbitrary or unconscionable." State v.Adams (1980), 62 Ohio St.2d 151, 157. Next, we note that there is a two-part test to meet before a new trial for juror misconduct is granted: 1) that there was juror misconduct; and 2) the misconduct prejudiced the person's case. State v. Keith (1997), 79 Ohio St.3d 514, 526.
The trial court in this case did not address the first part of the test; it assumed arguendo that the juror engaged in misconduct by sleeping while testimony was given by the shooter. The trial court ruled, however, that the second part of the test was not met because there was no showing that the alleged misconduct prejudiced appellant's case. We agree with the trial court that in this case there is no showing of prejudice to appellant's case. While appellant chooses to label the testimony of the shooter "crucial" we find that it was merely cumulative of the testimony given by his other witnesses who all testified that they did not hear appellant yell any direction to the shooter to shoot. Accordingly, even assuming arguendo that the juror did sleep during some of the shooter's testimony, we cannot find under these circumstances that it prejudiced appellant's case. We therefore cannot find that the trial court abused its discretion when it denied appellant's motion for a new trial on the basis of juror misconduct. Appellant's first assignment of error is not well-taken.
In support of his third and final assignment of error appellant argues that he was denied a fair trial because of prosecutorial misconduct. Specifically, he argues that the prosecutor made inflammatory statements during closing argument that appealed to the jury's emotions when the prosecutor showed a photograph of a "nasty" wound of one of the victims and when the prosecutor made remarks about the decency of the victims and opined that they were doing everything right by leaving the party. He also argues that the prosecutor commented on facts not in evidence when he talked about the drug culture and the nature of leadership in that culture.
Appellant acknowledges that his trial counsel chose not to object to the statements, but argues that the statements were so egregious, they constitute plain error. He argues that he received ineffective assistance of trial counsel because his attorney did not object to the improper argument presented by the prosecutor. He asks this court to reverse his conviction and to remand the case for a new trial.
We begin by noting that in Ohio, a plain error is defined as an:
 "Obvious error prejudicial to a defendant, neither objected to nor affirmatively waived by him, which involves a matter of great public interest having substantial adverse impact on the integrity of and the public's confidence in judicial proceedings. The error must be obvious on the records, palpable, and fundamental, and in addition it must occur in exceptional circumstances where the appellate court acts in the public interest because the error affects `the fairness, integrity or public reputation of judicial proceedings.'" State v. Craft (1977), 52 Ohio App.2d 1, 7, 367 N.E.2d 1221 (quoting United States v. Atkinson
(1936), 297 U.S. 157, 160, 80 L.Ed. 555, 56 S.Ct. 391.
In addition, we must consider the standard set by the Supreme Court of Ohio for reversing a conviction based upon prosecutorial misconduct. The Supreme Court of Ohio has said:
 "Ohio courts have suggested that the effect of counsel's misconduct `must be considered in the light of the whole case.' See, e.g., Mikula v. Balogh (1965), 9 Ohio App.2d 250, 258 [38 O.O.2d 311]. And where misconduct of counsel "* * * is of such a prejudicial character that the prejudice resulting therefrom cannot be eliminated or cured by prompt withdrawal, and admonition and instructions from the court of the jury to disregard it, a new trial should be granted, or the judgment reversed, notwithstanding cautions, admonition, and instructions by the trial judge." Book v. Erskine Sons, Inc. (1951), 154 Ohio St. 391, 401
[43 O.O. 334].
 "In general terms, the conduct of a prosecuting attorney during trial cannot be made a ground of error unless that conduct deprives the defendant of a fair trial. State v. Papp (1978), 64 Ohio App.2d 203, 211
[18 O.O.3d 157]; State v. Wade (1978), 53 Ohio St.2d 182, 186 [7 O.O.3d 362]; State v. DeNicola (1955), 163 Ohio St. 140, 148 [56 O.O. 185]; Scott v. State
(1923), 107 Ohio St. 475;, 490-491. This, then, is the point at which we begin in our analysis of this issue.
"* * *
 "[W]e are constrained to keep in mind that `[i]f every remark made by counsel outside of the testimony were ground for a reversal, comparatively few verdicts would stand, since in the ardor of advocacy, and in the excitement of trial, even the most experienced of counsel are occasionally carried away by this temptation.' Dunlop v. United States (1897), 165 U.S. 487, 498.
 "Recently, in State v. Smith (1984), 14 Ohio St.3d 13, we considered another case involving prosecutorial misconduct. We found at 14 that the prosecutor's personal attacks and accusations against defense counsel went so far beyond `the normal latitude allowed in closing arguments' that a fair trial was made impossible. In Smith, the prosecution argued that its improper comments were harmless in view of the sufficiency of the evidence to sustain a conviction. It further contended that prejudice was eliminated because the jury was instructed that closing arguments were not evidence. In light of the circumstances of the case, we found these claims to be without merit, and held: "[T]he general instruction that arguments of counsel are not to be considered as evidence was insufficient to correct the error. * * * In view of the fact that improper insinuations and assertions of personal knowledge by the prosecution are apt to carry great weight against the accused when they should properly carry none * * * some more definite guidance from the court was required." Id. at 15.
 "Important to our disposition of the instant issue is our observation in Smith that `it is not enough that there be sufficient other evidence to sustain a conviction in order to excuse the prosecution's improper remarks. Instead, it must be clear beyond a reasonable doubt that, absent the prosecutor's comments, the jury would have found the defendant guilty.' Id." State v. Maurer (1984), 15 Ohio St.3d 239, 266.
Keeping these standards in mind, we have carefully reviewed the record.
While we acknowledge that the remarks made by the prosecutor in closing argument are disturbing, we cannot find that in this case they rise to the level of plain error. We conclude that it is clear, beyond a reasonable doubt that the jury would have convicted appellant absent the prosecutor's improper arguments. We also conclude, therefore, that appellant did not receive ineffective assistance of counsel, since his case was not prejudiced by the now complained of statements made by the prosecutor in closing argument. See, State v. Bradley (1989),42 Ohio St.3d 136, 137, paragraph two of the syllabus. Appellant's third assignment of error is not well-taken.
After carefully reviewing the record and considering the arguments presented on appeal, we conclude that appellant was not prejudiced or prevented from having a fair trial. The judgment of the Lucas County Court of Common Pleas is affirmed. Appellant is ordered to pay the court costs of this appeal.
JUDGMENT AFFIRMED.