[Cite as *State v. Keith*, 2017-Ohio-5488.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## CRAWFORD COUNTY

STATE OF OHIO,

      PLAINTIFF-APPELLEE,                  CASE NO.  3-17-01

      v.

KEVIN A. KEITH,                         O P I N I O N

      DEFENDANT-APPELLANT.

Appeal from Crawford County Common Pleas Court
Trial Court No. 94-CR-0042

Judgment Affirmed

Date of Decision:    June 26, 2017

APPEARANCES:

    *Rachel Troutman and Zachary M. Swisher* for Appellant

    *Matthew E. Crall* for Appellee

Case No. 3-17-01

**SHAW, J.**

{¶1} Defendant-appellant, Kevin Keith ("Keith"), brings this appeal from the January 13, 2017, judgment of the Crawford County Common Pleas Court denying Keith's "Motion for Leave to File Delayed Motion for New Trial Based on Newly Discovered Evidence."

*Facts and Procedural History*

{¶2} In February of 1994 Keith was indicted for three counts of Aggravated Murder with capital-offense specifications and three counts of Attempted Aggravated Murder. Following a two-week jury trial, Keith was found guilty of all counts against him. The jury recommended, and the trial court imposed, a death sentence for each of the Aggravated Murder counts. This Court affirmed the convictions and sentence in *State v. Keith*, 3d Dist. Crawford No. 1996 WL 156710. The Supreme Court of Ohio then reviewed and affirmed the convictions and sentence in *State v. Keith*, 79 Ohio St.3d 514 (1997).

{¶3} In the Supreme Court of Ohio's opinion affirming Keith's convictions and sentence, the following facts were presented, which we quote from at length to provide context for the current appeal.

> **On the evening of February 13, 1994, Marichell Chatman, her seven-year-old daughter, Marchae, and Richard Warren, who had been living with Marichell and Marchae for several weeks, were at Marichell's apartment in the Bucyrus Estates. At the time, Marichell was babysitting her young cousins, Quanita and Quinton Reeves. At approximately 8:45 p.m., Marichell's**

aunt, Linda Chatman, arrived at the apartment to pick up Quanita and Quinton, Linda's niece and nephew.

A few minutes after Linda arrived, Warren, momentarily diverted from a basketball game he was watching on television, noticed a man standing outside the apartment door. Although the man began to walk away without knocking, Warren opened the door. The man turned and asked for Linda.

While Linda went outside and spoke with the man, Marichell told Warren the man's full name. Although Warren could recall only the first name, Kevin, he later identified appellant as the man at the door. Marichell also mentioned that Kevin had been involved in a big drug bust.

After a short time, Linda and appellant returned to the apartment, where appellant and Warren had a brief conversation. According to Warren, appellant appeared to have his turtleneck shirt pulled up over the bottom part of his face and even drank a glass of water through it.

After drinking the glass of water, appellant pulled a nine-millimeter handgun from a plastic bag he carried and ordered everyone to lie on the floor. Appellant repeatedly scolded Marichell for using his first name when she asked what he was doing and why. Despite Marichell's pleas with appellant on behalf of the children, appellant placed the gun to her head. After ordering Marichell to be quiet, appellant said, "Well, you should have thought about this before your brother started ratting on people." Marichell responded, "Well, my brother didn't rat on anybody and even if he did, we didn't have anything to do with it." Testimony at trial confirmed that Marichell's brother, Rudel Chatman, was a police informant in a drug investigation involving appellant. According to the presentence report, the month prior to the murders, appellant was charged with several counts of

**aggravated trafficking.**[1]

**Next, Warren heard a gunshot but was forced to turn away when a bullet struck him in the jaw. Warren heard ten to twelve additional shots, two more striking him in the back. After he heard the apartment door close, Warren ran out of the apartment, across a snow-covered field to Ike's Restaurant, yelling for help. Four or five more shots were fired, one striking him in the buttocks and knocking him down. Warren was able to get up and obtain help from the restaurant.**

**Another Bucyrus Estates resident, Nancy Smathers, heard several popping noises at approximately 9:00 p.m. As she looked out her front door, Smathers saw a large, stocky black man run to the parking lot and get into a light-colored, medium-sized car. As the car sped away, it slid on the icy driveway and into a snowbank. When the driver got out of the car, Smathers noticed that the car's dome light and the light around the license plate did not work. The driver rocked the car back and forth for nearly five minutes before he was able to free the car from the snowbank. Several weeks later, Smathers informed Bucyrus Police Captain Michael Corwin that, after seeing appellant on television, she was ninety percent sure appellant was the man she had seen that night.**

**When medical personnel arrived at the Bucyrus Estates apartment, Linda and Marichell Chatman were dead, having suffered multiple gunshot wounds, including fatal wounds to the neck or head. All three children initially survived the attack. However, Marchae's two gunshot wounds to her back proved fatal. The Reeves children each sustained two bullet wounds and serious injuries.**

**Approximately eight hours after the shootings, Warren was recovering from surgery at a Columbus hospital. During a**

---

[1] Although the Supreme Court of Ohio only cites the presentence report as indicating that the month prior to the murders Keith was charged with several counts of aggravated trafficking, there was testimony about this issue during the trial itself for the jury to consider. Lieutenant David Dayne of the Galion Police Department testified that Rudell Chatman, Marichell's brother, worked with police on a "covert drug operation[]" regarding Keith, which resulted in a series of indictments, including four counts of "trafficking" against Keith. (Trial Tr. at 589-90). According to Dayne, Keith was "out on bond" on those trafficking charges at the time of the murders in this case. (*Id*. at 590).

postoperative interview with a nurse, Warren wrote "Kevin" on a piece of paper as the name of his assailant. Later that day, Bucyrus Police Captain John Stanley had two telephone conversations with Warren. During the second conversation, Stanley mentioned three or four possible last names for Kevin. At trial, Stanley could only recall that he mentioned the names Kevin Thomas and Kevin Keith. Warren stated that he was seventy-five percent sure the name he heard from Marichell was Kevin Keith. When shown a photo array of six suspects, Warren chose appellant's picture and told police he was ninety-five percent sure that appellant was the murderer.

Investigators recovered a total of twenty-four cartridge casings from the crime scene area, which had all been fired from the same gun. In addition to those, investigators recovered a casing found on the sidewalk across from the entrance to a General Electric plant. On the night of the murders, appellant picked up his girlfriend, Melanie Davison, from work at the entrance to the General Electric plant where the casing was found.

At the snowbank where Smathers witnessed the getaway car slide, investigators made a cast of the tire tread and of the indentation in the snowbank made by the car's front license plate number—"043." The indentation from the license plate matched the last three numbers of a 1982 Oldsmobile Omega seized from Melanie Davison shortly after she visited appellant in jail, under the pseudonym of Sherry Brown, a few weeks after the murders.

The Oldsmobile was registered to Alton Davison, Melanie's grandfather, and was also regularly used by Melanie. Davison had put four new tires on the Omega six months prior to the murders. Davison estimated that by February 1994, the new tires had been driven less than 3,000 miles without any problems or need for replacement. Although the cast taken of the tire tread at the crime scene did not match tires found on the Oldsmobile Omega one month later, the cast did match the tread of the tires purchased by Alton Davison as shown on the tire's sales

> **brochures.[2] Additionally, the tires found on the Oldsmobile Omega had been manufactured in January 1994 and showed a minimal amount of wear.[3]**
>
> \* \* \*
>
> **After a two-week trial, a jury found appellant guilty of all counts.**

*State v. Keith*, 79 Ohio St.3d 514, 514-517. (1997)

{¶4} Following the Supreme Court of Ohio's affirmance of Keith's convictions and his sentence in 1997, Keith filed numerous post-conviction petitions, habeas corpus petitions, and motions for a new trial, which included motions for a new trial based on "newly discovered evidence." All of Keith's arguments have been analyzed and repeatedly rejected by the courts reviewing them, whether State or Federal.[4]

---

[2] Michelle Yezzo, whose testimony is primarily at issue in this appeal, testified that the partial tire imprint was similar to the tire markings in the brochure.

[3] We would add that testimony at trial indicated that the seized vehicle's dome light did not work and that the license plate light did not work either, corroborating the testimony of Smathers.

[4] This Court provided a history of Keith's various attempts to overturn his conviction up to 2011 in *State v. Keith*, 3d Dist. Crawford No. 3-10-19, 2011-Ohio-407. The following is a brief summary of that history. Keith filed his first petition for post-conviction relief in 1998, which was denied and the denial was affirmed on appeal. *State v. Keith*, 3d Dist. No. 3-98-05, 1998 WL 487044. In 1999 Keith filed a habeas corpus petition in a federal district court presenting eight grounds for relief, which was denied in 2001. That habeas petition was appealed and denied on appeal by the Sixth Circuit. *Keith v. Mitchell*, 455 F.3d 662 (C.A.6, 2006). In 2004 Keith filed a second petition for postconviction relief, which was denied, appealed to this Court, and the denial was affirmed. In 2007, Keith filed a motion for leave to file a delayed motion for new trial, which was denied, and he also filed a motion to reopen his direct appeal which was denied and affirmed by the Supreme Court of Ohio. *State v. Keith*, 119 Ohio St.3d 161, 2008-Ohio-3866. In 2008 Keith filed a motion for an evidentiary hearing for his motion for new trial, which was denied and affirmed on appeal. *State v. Keith*, 3d Dist. Crawford No. 3-08-15, 2008-Ohio-6187. In 2009 the Sixth Circuit Court of Appeals denied Keith's request to have a second habeas corpus petition considered. *Keith v. Bobby*, 551 F.3d 555 (2009). In May of 2010, Keith filed another motion for leave to file a delayed motion for a new trial arguing that the State had improperly suppressed evidence. The trial court denied that motion and it was affirmed by this Court on appeal. *State v. Keith*, 3d Dist. Crawford No. 3-10-19, 2011-Ohio-407. In March of 2014, it appears that Keith filed another Habeas petition in United States District Court, which was transferred to the Sixth Circuit Court of Appeals due to being a successive petition. *See Keith v. LaRose*, N.D. Ohio, 2014 WL 1369655.

{¶5} After the exhaustion of his appeals, Keith was scheduled to be executed on September 15, 2010. However, on September 2, 2010, Keith's sentence of death was "commuted to a term of life in prison without the possibility of parole" by then-Governor Ted Strickland.[5] (Doc. 232).

{¶6} After Keith's sentence was commuted to life in prison, Keith filed multiple, additional motions for a new trial, one of which was denied and one which was dismissed.

{¶7} On October 28, 2016, Keith filed another motion titled, "Motion for Leave to File Delayed Motion for New Trial Based on Newly Discovered Evidence," which is the primary subject of the current appeal. (Doc. No. 263). In his "Motion for Leave," Keith argued that he had obtained the personnel file of the State's forensic expert, G. Michelle Yezzo, which had not been provided to him in discovery prior to his trial. Keith contended that Yezzo's personnel file contained statements dating back to 1989 which indicated that some of Yezzo's coworkers felt she was mentally unstable, that Yezzo had used racial slurs, that Yezzo had a reputation among her coworkers for "stretch[ing] the truth to satisfy a department," and that Yezzo's coworkers thought that her findings and conclusions regarding

_____

[5] We would note that in his brief, Keith states that Governor Strickland commuted his sentence to a life sentence, "citing doubts about Keith's guilt as his reasoning for the commutation." (Appt.'s Br. at 1). Nowhere in the Warrant of Commutation of Sentence, which is included in the record, does Strickland cite "doubts" specifically about Keith's "guilt."

evidence "may be suspect."[6] Keith claimed that Yezzo's testimony was critical in convicting him by linking him to the car that fled the murder scene that got stuck in the snow as witnessed by Smathers. Keith argued that the information contained in Yezzo's personnel file would have been significant impeachment evidence of the State's forensic expert.

{¶8} Keith contended that he had no knowledge of the information contained in Yezzo's personnel file until 2016, that he certainly was not provided Yezzo's personnel file prior to his trial by the State, and that the State had not provided the personnel file at any time since. Further, Keith argued that BCI initially denied a public records request filed by Keith's counsel regarding Yezzo in 2009, though that request did *not* seek Yezzo's personnel file. Keith did eventually obtain the records he sought in the 2009 public records request, though not Yezzo's personnel file because it was not requested; nevertheless, Keith speculated that access to Yezzo's personnel file would have been denied like his original 2009 public records request, establishing that he was unavoidably prevented from obtaining Yezzo's personnel records.

{¶9} Keith supported his "Motion for Leave" by citing a separate trial court case, *State v. Parsons*, Huron No. CR930098, wherein the Huron County Common Pleas Court granted a defendant leave to file a motion for a new trial on the basis of

---

[6] Daniel L. Chilton, "Assistant Superintendent," catalogued the complaints of Yezzo's peers from a meeting of the "Mircro Section," and wrote them in a memo to Paul Ferrara, the Superintendent on May 11, 1989.

the State's failure to disclose Yezzo's personnel file in a 1993 murder case. Later, the same trial court actually granted the defendant a new trial based on the State's failure to disclose Yezzo's personnel file and the impeachment evidence contained therein. In doing so, the Huron County Common Pleas Court found that Yezzo's testimony was "important and significant in establishing [a specific] tool as the murder weapon and ultimately securing a conviction for the State." (Doc. No. 265, Ex. 17). According to the Huron County Common Pleas Court's entry, Parsons was only charged with murder over 10 years after the actual murder of his wife, and the trial court speculated that the cold case was perhaps only pursued on the basis of Yezzo's forensic findings linking the perceived murder weapon to Parsons. (*Id.*) In this case, Keith contended that his situation was similar to Parsons, arguing that Yezzo's testimony was critical in convicting him, and that at the very least his "Motion for Leave" should be granted.

{¶10} In the exhibits Keith included with his "Motion for Leave," Keith attached the affidavit of Lee Fisher, who was Ohio's Attorney General from 1991-1995. Fisher's affidavit stated that had he known in 1994 what he knows now regarding Yezzo's personnel file he "would not have permitted Ms. Yezzo to provide testimony against Kevin Keith. I also would have ordered the submitted evidence to be reanalyzed by a separate analyst." (Doc. No. 265, Ex. 3, p.3).

**{¶11}** By way of context regarding Yezzo's testimony during Keith's trial specifically, Yezzo testified via a trial deposition that was read into the record.[7] Yezzo's testimony indicated that she had been at BCI for over 17 years, that she had testified over 200 times in 49 counties in Ohio and that she had been qualified as an expert in prior cases. Specifically regarding this case, Yezzo testified that she was able to identify the numbers "043" in the region of the purported license plate area from impressions the license plate left in the snow bank when the vehicle was stuck, and that the numbers from the plate were in an area similarly placed to what they would be on the vehicle linked to Keith. Yezzo also testified that the tire tracks left at the scene were similar in tread pattern to the pattern in a tire brochure that had been submitted to her. Other witnesses were used to establish that the tires had been recently changed on the vehicle linked to Keith.

**{¶12}** However, it is also important to note that on cross-examination Yezzo indicated that she could not state with certainty that the license plate from the vehicle linked to Keith was the one that made the impression in the snow. In fact, Yezzo acknowledged that defense counsel had a list of numerous vehicles containing the

---

[7] At oral argument, Keith's attorneys insinuated that a trial deposition was used because Yezzo was on administrative leave from BCI for the issues specific to this case, such as her work performance. This is not accurate. The record indicates that Yezzo was placed on leave "to explore allegations of threatening statements that [Yezzo] made regarding an employee or employees of the Bureau of Criminal Identification & Investigation." Yezzo's personnel file details these purported threats, which Yezzo addressed and her responses were contained in the record. There is absolutely no indication that Yezzo was placed on leave for the allegations now being raised regarding substandard work or for falsifying documents to satisfy law enforcement.

sequential digits "043" from Richland and Crawford Counties alone. This supported the theory put forth by Keith's trial counsel to the jury that there were several other potential suspects, including Bruce Melton and Rodney Melton who had access to a car that had the sequential digits "043" in it.

{¶13} Yezzo also testified on cross-examination that she analyzed sweepings taken from the vehicle linked to Keith, and found no fibers inside connecting it to the murders. As to the tire tread similarities, Yezzo testified that she could only state that the tread pattern from the impression left in the snow was "similar" to those provided to her in a brochure because she only had a partial tread design from the print. (Yezzo Depo. Tr. at 23). Finally, defense counsel was able to get Yezzo to acknowledge that Keith's footwear, which had been obtained when Keith was later arrested, did *not* match the prints left at the scene.

{¶14} On the same date that he filed his "Motion for Leave," Keith also filed a document titled, "Motion for New Trial Based on Newly Discovered Evidence and/or Post-Conviction Relief Under Ohio Rev. Code § 2953.23." In the motion Keith argued more specifically that Yezzo's testimony was critically important in convicting him and that it was thus essential to have the "newly discovered evidence" to impeach Yezzo pursuant to *Brady v. Maryland*, 373 U.S. 83 (1963), and the State did not provide the file. Separately, Keith made essentially the same

arguments in the context of a successive petition for post-conviction relief under R.C. 2953.23.

{¶15} On October 31, 2016, the trial court filed an entry determining that Keith's actual "Motion for New Trial" was file-stamped erroneously by the clerk of courts, as it could not have been deemed to be filed until the court granted leave. The trial court then ordered a briefing schedule for the State to respond to Keith's "Motion for Leave" and for Keith to reply in support of his motion.

{¶16} Subsequently the State filed its brief in response to Keith's "Motion for Leave." The State argued Yezzo's personnel records were not required pursuant to *Brady* because the State was not aware of Yezzo's records, the State did not have them, and that in any event Yezzo's personnel records were not material to Keith's trial. The State argued that the portions Keith cited from Yezzo's personnel file calling her unstable, her conclusions unreliable, and questioning her integrity were actually from a summary of complaints made by Yezzo's *coworkers* during a union action, not any of her superiors. The State argued that there was no indication that any disciplinary action or other internal adjudication was ever taken against Yezzo on these issues or that the opinions of Yezzo's coworkers were the opinions of the BCI administration. In fact, the State argued that Yezzo's personnel file contained yearly reports with almost universally positive performance reviews. Moreover, the State argued that the evidence in Yezzo's personnel files would not have been

admissible at trial regardless as the pertinent documents contained improper hearsay within hearsay and improper character evidence.

{¶17} Furthermore, as to the testimony provided by Yezzo at trial more specifically, the State argued that a layman could clearly see the imprint of the license plate numbers "043" that were imprinted in the snowbank in this case and that a police officer actually stated this himself at trial separate from Yezzo's testimony, meaning that Yezzo added almost nothing with regard to the license plate number. As to the tire imprint, the State argued that Yezzo merely testified that the tire tracks were similar to tires that had purportedly been on the car at one time and that a separate witness testified that the tires had been changed without the permission of the owner.

{¶18} Finally, the State argued that Keith was required to clearly and convincingly show that he was unavoidably prevented from discovering the new evidence and he could not do so here. However, the State argued that even if Keith could show he was unavoidably prevented from discovering Yezzo's personnel file, the evidence against Keith was simply overwhelming in this case, particularly given the eyewitness testimony.

{¶19} On November 21, 2016, Keith filed a reply memorandum in support of his "Motion for Leave." Separately, Keith also filed a "Motion to Supplement Motion for Leave to File Delayed Motion for New Trial and Successor Petition for

Post-Conviction Relief Under R.C. § 2953.23." In his "Motion to Supplement," Keith argued that in a separate case in 2003, not involving Keith, there was a public records request for Yezzo's personnel files and the response to that request did not include the most damaging information against Yezzo from her personnel file. Keith argued that this further proved he was unavoidably prevented from discovering the information in Yezzo's personnel file. Keith also specifically noted that leave of court was not required to file a successive petition for post-conviction relief, "thus it is unclear what is the effect of those claims on this Court's October 31, 2016 ruling," which had determined that Keith's "Motion for New Trial" was improperly file-stamped by the clerk of courts. (Doc. No. 270, fn. 1).

{¶20} On January 13, 2017, the trial court issued a 13-page judgment entry on the matter denying Keith's "Motion for Leave." In its entry, the trial court summarized the parties' arguments, the applicable legal standards, Yezzo's testimony, and then conducted an analysis of the matter. In its analysis, the trial court also noted that Yezzo was subject to cross-examination during her trial deposition, wherein defense counsel could have explored her qualifications, deficiencies and disciplinary actions. The trial court noted that even though defense counsel did not probe these areas, it did not mean the information was unavailable to the defense.

{¶21} The trial court also determined that the information contained in Yezzo's personnel file was available through a public records request, that defense counsel made a request for public records in 2009 but did not include Yezzo's personnel file at that time, and that defense counsel failed to show the information was unavailable at the time of trial.

{¶22} The trial court concluded by determining that Keith had to show by clear and convincing evidence that the information in Yezzo's personnel file was unavailable to him with the exercise of reasonable diligence and he had failed to meet that standard as the information in Yezzo's personnel file could have been obtained through cross-examination or a public records request. Keith's "Motion for Leave" was thus denied. Keith then filed an appeal of the denial of his "Motion for Leave" with this Court, asserting the following assignments of error for our review.

**Assignment of Error No. 1**
**The trial court erred in denying appellant's motion for leave to file a new trial motion based on newly discovered evidence.**

**Assignment of Error No. 2**
**The trial court erred in holding that Keith failed to demonstrate a *Brady* violation.**

**Assignment of Error No. 3**
**The trial court erred in striking the filing of Keith's successor post-conviction petition and new trial motion.**

*First Assignment of Error*

**{¶23}** In his first assignment of error, Keith argues that the trial court abused its discretion in denying his motion for leave to file a motion for a new trial based on newly discovered evidence.

**{¶24}** The time for filing a motion for a new trial based on newly discovered evidence is governed by Crim.R. 33(B). It reads, in pertinent part,

> **Motions for new trial on account of newly discovered evidence shall be filed within one hundred twenty days after the day upon which the verdict was rendered, or the decision of the court where trial by jury has been waived. If it is made to appear by clear and convincing proof that the defendant was unavoidably prevented from the discovery of the evidence upon which he must rely, such motion shall be filed within seven days from an order of the court finding that he was unavoidably prevented from discovering the evidence within the one hundred twenty-day period.**

**{¶25}** Crim.R. 33(B) has thus been interpreted as having "a two-step procedure when a defendant seeks to file a motion for new trial outside the 120–day deadline." *State v. Howard*, 10th Dist. Franklin No. 15AP-161, 2016-Ohio-504, ¶ 48. "In the first step, the defendant must demonstrate that he was unavoidably prevented from discovering the evidence relied upon to support the motion for new trial." *State v. Bethel,* 10th Dist. No. 09AP–924, 2010-Ohio-3837, 2010 WL 3239480, ¶ 13. In the second step, if the defendant does establish unavoidable prevention by clear and convincing evidence, the defendant must file the motion for new trial within seven days from the trial court's order finding unavoidable

prevention. *Id.,* citing *State v. Woodward,* 10th Dist. Franklin No. 08AP–1015, 2009-Ohio-4213.

**{¶26}** "A defendant demonstrates he was unavoidably prevented from discovering the new evidence within the 120–day time period for filing a motion for new trial when the defendant 'had no knowledge of the evidence supporting the motion for new trial and could not have learned of the existence of the evidence within the time prescribed for filing such a motion through the exercise of reasonable diligence.' " *Howard* at ¶ 49, quoting *Bethel* at ¶ 13, citing *State v. Berry,* 10th Dist. Franklin No. 06AP–803, 2007-Ohio-2244, ¶ 19. "Clear and convincing proof that the defendant was 'unavoidably prevented' from filing 'requires more than a mere allegation that a defendant has been unavoidably prevented from discovering the evidence he seeks to introduce as support for a new trial.' " *State v. Lee,* 10th Dist. Franklin No. 05AP–229, 2005-Ohio-6374, ¶ 9, quoting *State v. Mathis,* 134 Ohio App.3d 77, 79 (1st Dist.1999). The standard of clear and convincing evidence has been defined by the Supreme Court of Ohio as "proof which is more than a mere 'preponderance of the evidence,' but not to the extent of such certainty as is required 'beyond a reasonable doubt' in criminal cases, and which will produce in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established." *Cross v. Ledford,* 161 Ohio St. 469 (1954), paragraph three of the syllabus.

{¶27} We review a trial court's decision granting or denying a Crim.R. 33(B) motion for leave to file a delayed motion for a new trial under an abuse of discretion standard.[8] *Howard*, *supra*, at ¶ 46. An abuse of discretion is a decision that implies the court's determination was arbitrary, unreasonable, or unconscionable. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219 (1983).

{¶28} With the preceding standards in mind, we must thus determine whether the trial court abused its discretion in finding that Keith failed to demonstrate by clear and convincing evidence that he was unavoidably prevented from discovering Yezzo's personnel file and the statements contained therein.

{¶29} In denying Keith's "Motion for Leave" in this case, the trial court made two primary findings: 1) Yezzo was subject to cross-examination and Keith could have attacked her qualifications and performance in her trial deposition in order to learn about her, particularly on any disciplinary issues, but he chose not to do so; and 2) Keith did not meet his burden to establish that Yezzo's personnel file was unavailable through a public records request.

---

[8] Had the trial court granted Keith leave to actually file a motion for a new trial, we would also review the trial court's decision on the motion for a new trial itself under an abuse of discretion standard. However, in order to actually obtain a new trial, Keith would have to show far more than he was unavoidably detained from discovering the evidence. He would have to show that "the new evidence (1) discloses a strong probability that it will change the result if a new trial is granted, (2) has been discovered since the trial, (3) is such as could not in the exercise of due diligence have been discovered before the trial, (4) is material to the issues, (5) is not merely cumulative to former evidence, and (6) does not merely impeach or contradict the former evidence." *State v. Petro*, 148 Ohio St. 505 (1947), at syllabus. As will be discussed *infra* Keith cannot establish that there was a strong possibility the evidence would change the result of his trial, and he would have difficulty establishing multiple other provisions under *Petro* as well.

{¶30} On appeal, Keith claims that both of the trial court's findings were erroneous. He contends that with regard to the cross-examination of Yezzo, the pertinent impeachment evidence was not disclosed by the State and unknown by the defense thus cross-examination could not cure the issue, and with regard to the public records request, Keith claimed that in other cases unrelated to Keith it had proven difficult to obtain Yezzo's personnel file. Further, Keith argued that a public records request regarding Yezzo in 2009 that did not request her personnel file was initially denied.

{¶31} We will address the trial court's second finding regarding Keith's ability to make a public records request as it is dispositive of this assignment of error. In its entry on the matter, the trial court noted that the record did not show that Keith's original defense counsel attempted to obtain any information concerning Yezzo's personnel file prior to trial. The trial court added that Keith did not establish by clear and convincing evidence that he could not obtain Yezzo's personnel file through a public records request prior to the time of his trial or within a reasonable time thereafter. The trial court further stated that Keith seemingly waited 15 years to request *any* public records regarding Yezzo and that when Keith made a public records request in 2009, the request still did not even include Yezzo's personnel file. Thus the trial court determined that Keith failed to meet his burden by clear and convincing evidence that he was unavoidably prevented from obtaining

Yezzo's personnel file prior to 2016, as the record is devoid of any actual indication that such an attempt was made and denied.

{¶32} While Keith points to other cases where Yezzo's personnel file may have been left out of discovery or portions of Yezzo's file may not have been disclosed, as the trial court noted we have no true knowledge of what was sought and what was turned over in those cases thus those cases are of very little value. In addition, Keith cites to his own attempt to obtain public records regarding Yezzo in 2009, which was initially denied, but the denial, as stated in emails included in the record, was based on Keith's ongoing federal litigation. Nevertheless, Keith did eventually obtain the records he sought. Thus none of the cases cited by Keith, including his own 2009 attempt, establish that the trial court abused its discretion by determining that Keith did not establish by clear and convincing evidence that he was unavoidably prevented from obtaining Yezzo's personnel file via a public records request.

{¶33} On the basis of the record before us, we cannot find that the trial court abused its discretion. It was Keith's burden to establish that he was unavoidably prevented from obtaining Yezzo's personnel file and there is simply no indication other than pure speculation that he would have been unable to obtain Yezzo's file through a public records request. As we have found that the trial court did not abuse its discretion based on the public records request issue, we need not discuss the trial

court's separate finding regarding cross-examination. Therefore, Keith's first assignment of error is overruled.

*Second Assignment of Error*

**{¶34}** In Keith's second assignment of error, he argues that the trial court erroneously rejected Keith's claim of a *Brady* violation in this case. *Brady v. Maryland*, 373 U.S. 83 (1963).

**{¶35}** The Supreme Court of the United States has held that there are three essential components of a *Brady* violation: 1) the State either willfully or inadvertently suppressed evidence, 2) the evidence was favorable to the accused, and 3) there was resulting prejudice. *Strickler v. Greene*, 527 U.S. 263 (1999).

**{¶36}** On appeal, Keith claims that the State *at least* inadvertently suppressed Yezzo's personnel file, that Yezzo's file contained evidence favorable to Keith as it was impeachment evidence of a witness he characterized as "critical," and he argues that absent Yezzo's testimony the evidence linking Keith to the crime was minimal.

**{¶37}** The State counters by stating that even assuming the evidence was favorable to Keith, and even assuming it had been inadvertently suppressed by the State, the information contained in Yezzo's personnel file would not have changed the outcome of this case. The State maintains that the statements in Yezzo's personnel file that Keith argues are damaging were statements made by coworkers and catalogued by administrators, making the statements hearsay within hearsay and

inadmissible at trial even if they were discovered. The State also contends that Keith could not introduce the statements anyway as they were improper character evidence pursuant to Evid.R. 608(B).

{¶38} In our own review of the matter, even if we assumed, without finding, that the State inadvertently suppressed Yezzo's personnel file, and even if we assumed that Yezzo's personnel file contained evidence favorable to Keith, we absolutely could not find in the circumstances of this case that prejudice resulted here. Keith may claim that Yezzo was a critical witness tying him to the crime, but Yezzo provided testimony regarding a license plate number that was elicited elsewhere such as through the testimony of Patrolman Edward Wilhite of the Crestline Police Department and David Barnes of BCI, and she provided limited probative testimony regarding the tires at the scene. (Tr. At 424, 478-79). In fact, Yezzo actually provided one key piece of evidence *for the defense*, being that the footprints taken from the scene did not match later-acquired footwear from Keith.

{¶39} A thorough review of the transcripts further reveals that the primary testimony linking Keith to the crime was from Warren and Smathers. Warren specifically identified Keith at trial as the man who shot him. As he woke up in the hospital after the shooting, Warren remembered the name "Kevin" as the person who shot him. He later gave the last name "Keith" when presented with possible last names of the shooter. Warren also recalled specific discussions on the night of

the murder that the man who came to the house was Kevin Keith and that he had been part of a drug bust recently, which was actually true of Keith, giving further credibility to Warren's identification. Then, Warren also picked Keith out of a photo lineup. Warren was thus able to identify Keith through multiple means as the shooter.

{¶40} Furthermore, Nancy Smathers identified Keith at trial as the man she saw getting stuck while trying to leave the scene. Smathers also testified that the dome light did not work on the car Keith was driving, and that the license plate light did not work. When the car Keith was using was seized, both of those things were found to be true, corroborating her story, and also adding credibility to Smathers' eyewitness identification. Smathers' testimony alone links Keith to the car, even if Yezzo had never testified at all in this case. Moreover, a bullet casing was found near the area where Keith picked his girlfriend up from work that matched the bullet casings from the crime scene.

{¶41} Over the years in his numerous appeals and post-conviction petitions Keith has challenged many aspects of his case and the evidence against him, but one fact remains clear, the evidence against Keith was simply overwhelming.[9] Based on the record we cannot find that, even assuming Yezzo's personnel file was

---

[9] Both at his trial and following his convictions Keith has strongly pursued the defense that another man committed the killings, specifically Rodney Melton. That theory was presented at trial, along with multiple other individuals the defense contended were the potential killers. Rodney Melton, along with the others, actually testified for the jury to see and hear and the jury rejected the defense's theories.

suppressed, and that it contained information favorable to Keith, there is no reasonable possibility that the information contained in Yezzo's file would have made any difference in the outcome of this case.[10]

{¶42} For all of these reasons, Keith's second assignment of error is overruled.

*Third Assignment of Error*

{¶43} In Keith's third assignment of error, Keith argues that the trial court erred by "striking" the filing of Keith's successor post-conviction petition and his actual "Motion for New Trial."

{¶44} As we have found that the trial court did not abuse its discretion in denying Keith leave to file a new trial motion, any error in striking the actual motion itself would be moot, and we will not further address it.

{¶45} As to Keith's claims that the trial court improperly struck his successor post-conviction petition at the same time his "Motion for New Trial" was stricken, the record simply does not support this statement. The trial court's October 31, 2016, judgment entry only states that "the Motion for New Trial * * * cannot be deemed to have been filed until the Court grants the Defendant leave to file such

---

[10] Although Keith presented a case out of the Huron County Common Pleas Court that found otherwise, the facts of that case, from what little we have available, indicate that Yezzo's testimony was absolutely critical in reopening a cold case and convicting the defendant. Those circumstances are not remotely present here. Further, one of the findings of Yezzo was *clearly* favorable to Keith in this matter, indicating perhaps a strong desire by defense counsel not to challenge Yezzo's credentials.

motion." The trial court made no mention of the successor petition for post-conviction relief. If we assumed that the trial court's entry "striking" the "Motion for New Trial" also "struck" the successor post-conviction petition and effectively dismissed it, then the proper time to appeal that dismissal would have been within 30 days of the trial court's October 31, 2016, judgment entry.

{¶46} However, Keith did file a "Motion to Supplement Motion for Leave to File Delayed Motion for New Trial and Successor Petition for Post-Conviction Relief Under R.C. § 2953.23" after his "Motion for a New Trial" was "stricken." When the trial court denied Keith's "Motion for Leave" the trial court's judgment entry stated only that Keith's "Motion for Leave" was denied. The entry does not make any final determination with regard to the "Successor Petition for Post-Conviction Relief." Thus there is no final judgment dismissing this issue before this Court to review, and any argument pertaining to it is not ripe.[11] Accordingly, Keith's third assignment of error is overruled.

*Conclusion*

{¶47} For the foregoing reasons Keith's assignments of error are overruled

---

[11] We note that while it appears the trial court has not officially ruled on Keith's successor petition for post-conviction relief, the arguments are the same as they are in the motion for a new trial, thus there is little merit to any further proceeding on the matter.

and the judgment of the Crawford County Common Pleas Court is affirmed.

***Judgment Affirmed***

**PRESTON, P.J. and ZIMMERMAN, J., concur.**

**/jlr**